COMMONWEALTH vs. DAVID M. COHEN (No. 1).*

Norfolk. September 9, 2009. - February 17, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Jury and Jurors. Practice, Criminal,* Public trial, New trial, Instructions to
jury, False report. *Constitutional Law,* Public trial, Freedom of speech and
press, Jury, Waiver of constitutional rights. *Waiver. Intimidation of Witness.
Witness,* Intimidation. *Extortion.*

The jury empanelment in a criminal case, in which members of the public,
    including the defendant's friends and supporters, were excluded from the
    court room through the intentional application of a court house policy,
    while the defendant's family members and some other individuals beyond
    the parties and counsel were present in the court room, constituted a partial
    closure of the court room and contravened the defendant's right to a public
    trial protected by the Sixth Amendment to the United States Constitution,
    where the closure was broader than necessary to protect the substantial
    reasons justifying the closing (i.e., lack of space and preventing the
    intermingling of prospective jurors with spectators); where the judge failed
    to consider reasonable alternatives to closure; where the record did not
    provide sufficient support for the extensive closure that occurred; and
    where the defendant had not, through inaction, delay, or otherwise, waived
    his right to have the public hear the judge's questions and witness the
    prospective jurors' responses; accordingly, the defendant was entitled to a
    new trial. [106-119]
At a criminal trial, the judge properly denied the defendant's motion for
    required findings of not guilty on indictments charging witness intimida-
    tion in violation of G. L. c. 268, § 13B, where there was sufficient evidence
    that the defendant had wilfully endeavored to influence the witnesses by
    means specified in the statute, i.e., misrepresentation and intimidation.
    [119-124]
A criminal defendant charged with filing a false police report in violation of
    G. L. c. 268, § 6A, failed to demonstrate that the inaccuracy contained in
    his report was not material within the meaning of that statute. [125-126]
At the trial of indictments charging the defendant (a police officer) with, inter
    alia, attempted extortion in violation of G. L. c. 265, § 25, the judge's
    instructions to the jury adequately conveyed the difference between permis-
    sible discretionary actions by a police officer and wrongful conduct that
    would fall within the statute's scope. [126-127]
This court declined to consider a matter that did not rise to the level of
    adequate appellate argument. [127]

*This opinion, which was originally released on January 7, 2010, was tempor-
arily withdrawn by the court and has been republished — REPORTER'S NOTE.

INDICTMENTS found and returned in the Superior Court Department on March 4, 2005.

The cases were tried before *Barbara A. Dortch-Okara*, J., and a motion for a new trial was heard by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Wendy H. Sibbison* for the defendant.

*Stephanie Martin Glennon*, Special Assistant District Attorney (*George R. Jabour*, Special Assistant District Attorney, with her) for the Commonwealth.

*David J. Nathanson & Dan Horowitz*, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

*Timothy J. Cruz*, District Attorney, *& Mary Lee*, Assistant District Attorney, for District Attorney for the Plymouth District, amicus curiae, submitted a brief.

BOTSFORD, J. A Superior Court jury found the defendant, David M. Cohen, an attorney and former Stoughton police sergeant, guilty of attempted extortion, G. L. c. 265, § 25; filing a false police report, G. L. c. 268, § 6A; and two charges of witness intimidation, G. L. c. 268, § 13B.[1,2] He brings this appeal from his convictions and from the denial of his motion for a new trial. The defendant claims that his constitutional right to a public trial was violated during jury empanelment proceedings by the exclusion from the court room of members of the public, including his friends and supporters. Additionally, he claims that there was insufficient evidence to warrant his convictions of witness intimidation and filing a false police report, and that an error in the jury instruction on the charge of attempted extortion requires a new trial on that charge. We conclude that the jury empanelment in this case contravened the defendant's right to a public trial protected by the Sixth Amendment to the United States Constitu-

---

[1]The events giving rise to these charges occurred in 2002. The jury acquitted the defendant of three other crimes arising out of the same set of facts: kidnapping, G. L. c. 265, § 26; conflict of interest, G. L. c. 268A, § 19 (*a*); and assault and battery, G. L. c. 265, § 13A (*a*). The jury also acquitted him on charges relating to a separate incident that occurred in 2000.

[2]The defendant received concurrent State prison terms of from two and one-half to three years on each witness intimidation charge, a concurrent year in a house of correction on the charge of filing a false police report, and three years' probation on the charge of attempted extortion.

tion, and that accordingly, he is entitled to a new trial. We further conclude that the evidence presented on the charges of witness intimidation and of filing a false police report was sufficient to support the jury's verdicts, and therefore that the defendant may be retried on all charges of which he was convicted. Finally, we find no error in the challenged jury instruction.

*Background.* a. *The trial.* The evidence at trial would have permitted the jury to find the following.[3] At all relevant times the defendant worked as a lawyer by day and as a Stoughton police sergeant on the 4 P.M. to midnight shift. On April 22, 2002, Peter Marinilli, the younger brother of the defendant's close friend, contacted the defendant and told him that a man named Timothy Hills had "scammed" him. In particular, Marinilli told the defendant that Hills had solicited $10,000 from him, supposedly as an investment in a restaurant called "Pizzapalooza" that would generate a thirty per cent return by April 1, 2002. When Marinilli asked Hills for his money, Hills gave him only excuses. When Hills finally gave Marinilli a check, it did not clear.

On April 22 or 23, the defendant left Hills a telephone message stating that Hills could pay Marinilli back or face criminal charges.[4] That same afternoon, Hills drove with Brian Sexton, an employee of Hills's company, to the defendant's law office to meet with him. Hills told the defendant that he was aware he owed Marinilli money, but that he needed to "make arrangements to try and get him his money back."

During the next few days, Hills and the defendant exchanged more telephone calls. On April 26, Hills delivered to the defendant, as "a deposit," a $1,000 money order made out to Marinilli. Hills agreed to meet with the defendant at his law office on

---

[3]The trial evidence summarized here does not include the evidence relevant to the two charges of witness intimidation or the charge of filing a false police report. We summarize that evidence hereafter in connection with our discussion of the defendant's legal claims concerning those three charges.

[4]Timothy Hills testified at trial that he received a telephone call from "an attorney who said that he represented Marinilli" in which the caller stated, "You need to get in touch with me as soon as possible to resolve this matter for $10,000. Mr. Hill[s], we can either handle this through this office or my other job." The defendant testified that he never represented Marinilli and that he left Hills the initial message in his capacity as a police officer. The jury appears to have believed the defendant, as it acquitted him of municipal employee conflict of interest, G. L. c. 268A, § 19 (*a*).

April 30 to discuss the remaining $9,000 debt. The defendant was in a meeting when Hills arrived on that date, and Hills told the receptionist that he would return. The defendant, however, did not receive Hills's message about returning, and left the following voice mail message on Hills's telephone:

> "Tim Hills, this is David Cohen at 12:30. As you can imagine, I'm not too happy with you right now. I told you — you told me you were going to be here by noon. And, Tim, I'm pretty much at the end of my rope as far as your story goes. . . . I guess I'm going to do what I have to do and it might not be pretty. So, get in touch with me."

Hills and the defendant met later that day at a local restaurant. After the defendant threatened arrest if Hills did not pay Marinilli, Hills produced a $9,000 check. The defendant took the check to the bank to determine whether it would clear. When the bank teller, Jamie Kelly, informed him that it would not, the defendant drove in his police cruiser to Hills's office. When the defendant arrived, he ran a registration check on Hills's truck, found that the registration had expired, and called a private company for a tow. The defendant, who was armed and in his police uniform, then walked into Hills's office and confronted him. He placed Hills in handcuffs and threatened to lock him up and keep his truck impounded if he did not bring the $9,000 to the police station by 4 P.M. the next day. The defendant removed the handcuffs before leaving Hills's office, returned to the station, and wrote a police report about the incident. He also prepared applications for a criminal complaint against Hills, as well as an arrest warrant. The following day, the defendant submitted his police report and applications for complaints when Hills failed to bring the $9,000.

On May 3, 2002, an arrest warrant for Hills issued from the Stoughton Division of the District Court Department, along with a complaint charging larceny by false pretenses and two counts of uttering. Also on May 3, Hills went to the police station to complain about the defendant. The police lieutenant with whom Hills spoke left for a few minutes. When he returned, he told Hills that he had good news and bad news: Hills could get his truck back, but the defendant had obtained a warrant for his arrest. Hills was processed, fingerprinted, and put in a cell. He

was released shortly thereafter on twenty-five dollars' bail. The charges against him were later dismissed because he cooperated with an internal police department investigation of the defendant.

b. *Jury empanelment.* A Norfolk County grand jury indicted the defendant in March of 2005, and also indicted Stoughton police Officer Robert Emmet Letendre.[5] The two men were tried together. Jury selection began the afternoon of June 18, 2007, and continued through June 25.[6] Before empanelment began on June 18, the judge explained:

> "What I intend to do, once the defendants are placed at the bar, [is] to introduce myself, to give a description of the case, to have the attorneys introduce themselves and their clients [as] they desire. Read the list of prospective witnesses, give them the estimate of the length of the trial, and then proceed into the questioning. And once the questioning is completed, begin to fill the jury box, entertaining your objections or challenges for cause when they arise, calling to the sidebar those jurors who've raised their hand[s] for any reason."

Jury selection began in the afternoon of June 18. Seventy-eight prospective jurors were brought to the court room, and the empanelment process went forward as the judge had described. Only a few jurors were seated before the end of the day on June 18. Empanelment continued over the next two days in the same manner as on June 18. At the beginning of the morning session on June 21, the fourth day, the defendant's counsel stated to the judge at sidebar, "When I came in this morning I saw a sign on the door that says: 'Jury empanelment Do not enter.' "[7] He continued:

> "I have found out that the sign has been on the door

---

[5]Letendre was charged with being an accessory after the fact to a false arrest made by the defendant and with filing a false police report, both based on the 2000 incident that was the basis of separate charges against the defendant. See note 1, *supra.* The jury acquitted Letendre of both charges.

[6]The court was not in session on Friday, June 22, 2007. Jury empanelment therefore took place over the course of five days: Monday, June 18, through Thursday, June 21, and on Monday, June 25, 2007.

[7]In fact, the sign stated, "Jury Selection in Progress. Do Not Enter." Nothing turns on the phrasing that actually appeared on the sign.

from the beginning of the trial apparently. Then, I did some more checking and I found out that people have been denied entry into the courtroom and told that the courtroom is closed by the court officers downstairs and have been denied entry into the courtroom. At least two people have told my client that, and I haven't checked."

Counsel moved for a mistrial, stating that the judge "never made findings on the record or had a hearing as to whether or not the courtroom ought to be closed." The judge denied the motion.[8]

A short while later, the defendant's counsel made an offer of proof in which he stated that several of the defendant's friends

---

[8]The following exchange took place in connection with the judge's denial of the defendant's motion for a mistrial, in which the judge explained the reasons for the "Do Not Enter" sign:

THE JUDGE:    "The motion is denied. No one has been denied access. That sign, there is a particular issue of people coming and going through. If anyone wants to come into the courtroom as the relatives did, I'm sure it would have been brought to my attention and I would let them in.

"The problem initially has been the space for the venire. That is no longer a problem. But another concern is having the local district attorneys walk through the building, the Norfolk DA's coming in inadvertently, and I don't want there to be any issue raised by the appearance of a Norfolk district attorney in the courtroom. I don't want spectators commingling with prospective jurors.

"That would take additional resources to shield them from prospective jurors. So, no one is denying access. This is a matter of accommodating the space and taking extra precaution. If there are individuals who want to come in, they can make that known and would be allowed in."

DEFENSE COUNSEL:    "They have made it — I would ask for an evidentiary hearing."

THE JUDGE:    "No, sir."

DEFENSE COUNSEL:    "The Court's statement that no one has been denied entry is simply false, and you have not a shred of evidence to support that."

THE JUDGE:    "Thank you, sir. Now we will proceed with the empanelment. . . ."

Commonwealth *v.* Cohen (No. 1).

and supporters would testify that they were denied entry. The judge responded that the defendant's motion for mistrial had already been denied.

Later that same morning, the defendant's counsel raised the issue a third time, stating, "Your Honor, I want the record to reflect that someone just entered the courtroom and the court officers ushered him out. They told him to leave." The judge responded, "I will inquire." This exchange followed:

| | |
|---|---|
| THE JUDGE: | "[W]ho was that coming into the courtroom?" |
| COURT OFFICER: | "It was one of the Stoughton police officers." |
| THE JUDGE: | "All right. That was a Stoughton police officer."[9] |
| DEFENSE COUNSEL: | "And why is he not allowed in the courtroom?" |
| THE JUDGE: | "Well, you registered your objection, so I will deal with it later. I just wanted to know who it was." |
| DEFENSE COUNSEL: | "I would like to move for a mistrial." |
| THE JUDGE: | "Denied." |

After a recess, defense counsel informed the judge that the man the court officers had removed from the court room was the defendant's civilian friend, Peter Rappoli, not a uniformed Stoughton police officer, and that at the time Rappoli was removed, there was ample room for the public to sit in the court room, separated from the prospective jurors. Counsel again moved for a mistrial. The judge denied the motion.

At the conclusion of jury empanelment on June 25, 2007, the case proceeded to trial. On July 30, the jury returned guilty

[9]Before jury selection began, the judge asked the court officers to inform the Stoughton police department that officers were welcome to attend, but not in uniform. She based this order on the potential that a large number of officers would attend, with strong feelings about the case. Defense counsel objected, but knew of the order. The defendant does not challenge that order on appeal.

verdicts on four of the seven charges against the defendant. On August 10, the defendant filed a motion for a new trial based on his claim that the jury empanelment process had contravened his Sixth Amendment right to a public trial. The judge held an evidentiary hearing on the motion, at which several of the defendant's friends and supporters testified that either the "Do Not Enter" sign or court officers kept them out of the empanelment.[10] Additionally, Alan Stein, a freelance reporter who had been hired by the Patriot Ledger and the Brockton Enterprise to cover the defendant's trial, testified that on the first day of empanelment, a court officer had informed him while he was outside the court room that he would not be permitted in the court room during empanelment; Stein further testified that he went to the court house on the other days of empanelment, but understood the "Do Not Enter" sign on the door to mean that he could not enter, and therefore he sat on a bench outside the court room and did not attempt to enter. Jeff Mucciarone, a reporter for the Stoughton Journal and Canton Journal, also testified. He stated that on June 18, as he and a photographer for his newspapers were leaving the press section of the court room after a motion hearing that preceded the commencement of empanelment, a court officer told him that he would have to leave during jury selection. He was present in the court house during all the days of empanelment, but never went into the court room, concluding that the "Do Not Enter" sign was conveying the same message the court officer had: that he would not be allowed in.

The judge denied the defendant's motion for a new trial on June 27, 2008. In her decision, the judge found that the largest court room in the Norfolk County Superior Court court house was used for this trial because the judge expected it to be lengthy, to be followed closely by the press and public, and to require an unusually large jury pool.[11] She made findings about the court's

[10]Seven of the defendant's friends and supporters testified to this effect at the motion hearing. One of the seven had been listed as a potential trial witness, and would not have been allowed in the court room for empanelment in any event because of a witness sequestration order in the case.

[11]The judge further found that the court room has two major seating areas, one on either side of a center aisle, that together seat approximately one hundred people; that two jury boxes seat another sixteen to twenty people each, although the court only uses one for seating due to the other's proximity

policy for jury empanelments, and found that it had been applied in this case:

> "According to [the acting chief court officer], it is the practice at Norfolk Superior Court to exclude the public (other than the media) from jury empanelment if there is no room for spectators. However, where there is room, spectators are placed in the seating areas on the sides of the courtroom. The media are routinely seated in the enclosure to the left of the judge's bench. The intent of the policy is to insure that jurors are not intermingled with the public. *All the court officers were instructed by [the acting chief court officer] that the courtroom would be 'closed' for this empanelment*" (emphasis added).[12]

to sidebar; and that two additional enclosed seating areas, one on either side of the judge's bench, each hold ten people. These findings indicate that a total of 136 to 140 seats were available in the court room for the potential jurors and spectators.

[12]The lobby court officer for the defendant's trial was a witness at the hearing on the new trial motion. In responding to questions on direct examination posed by the defendant's attorney, the court officer elaborated on this jury empanelment policy:

*Q.*: "Is it your practice as a court officer in the Norfolk Superior Court to close the courtroom to the public during jury selection?"

*A.*: "Yes."

*Q.*: "On each and every occasion?"

*A.*: "Yes."

*Q.*: "And without exception?"

*A.*: "Yes."

*Q.*: "And when you — when you close — when you say 'close the courtroom', that means you exclude all members of the public from the jury selection process, correct?"

*A.*: "Yes."

*Q.*: "And you — and — and did you do that in the David Cohen case?"

*A.*: "Yes."

The court officer answered some questions on cross-examination by the Commonwealth's attorney that suggested he let, or was willing to let, members of the public into the court room whenever there was room to accommodate them. He also testified that he had followed the judge's directive to do so

The judge further found that the court officer and the defendant's counsel made special seating arrangements for the defendant's family beforehand, as counsel "was aware that the public could not be accommodated in the spectators' gallery because of the large number of jurors."[13] The judge stated the court officer had informed her that the defendant's family would sit in the right enclosure and that they did sit there throughout jury selection.

The judge next found that there had been large numbers of potential jurors called for the first three days of empanelment: jurors appeared in panels of seventy-eight on June 18, eighty-eight on June 19, and seventy-nine on June 20. Because the empanelment process on some or all of these days did not reach every juror present, jurors who had not been reached returned the next morning, and the panels of new jurors came into the court room in the afternoon. She found that "although the crowd lessened at times during the morning, the courtroom would again fill in the afternoon on those dates." She stated that the "venire was cautioned not to speak aloud in the courtroom" and "every exchange occurring between the court and individual prospective jurors was conducted at sidebar outside of public hearing and out of earshot of the defendant" because he had agreed to closed individual voir dire. However, the judge noted that she called jurors to the sidebar based on their responses to

---

beginning on June 21. On direct examination, however, the following exchange with the defendant's counsel took place:

> *Q.:* "[S]o there's no mistake, on June 21, for the whole of that day —
> right — you did the best you could to exclude the public from the
> courtroom, right?"
>
> *A.:* "Yes."
>
> *Q.:* "And that goes for the Monday, June 25, too, isn't that right."
>
> *A.:* "Yes."

[13]The defendant's trial counsel was a witness at the hearing on the motion for a new trial. He testified that prior to empanelment, he made special arrangements for the defendant's family to be seated because "they were bringing in a lot of jurors." However, he stated that the only limitation on court room access of which he was aware was the judge's order that Stoughton police officers not attend the proceedings in uniform. He testified that he did not see the "Do Not Enter" sign until June 21, the day he objected.

questions she had posed publicly to the potential jurors as a group, which they gave by raising their hands.

The judge found that "the court was first advised of the ['Do Not Enter'] sign and the access issue on June 21; there were no repeated objections to the exclusion of the public; and the court did take corrective action, including ordering the sign removed." She found that while court officers removed Peter Rappoli later that day, they did so mistakenly and Rappoli "did not seek to determine the reason he was required to leave the courtroom" and "[b]y the time the court determined that he was not in police uniform, he had left the courthouse." She added that at the time, "there were other members of the public present and undisturbed." With respect to the reporters, she found that "a court officer asked Mr. Mucciarone to leave the courtroom for jury selection and separately asked Mr. Stein not to come in during jury selection." However, she found that the two men did not identify themselves as press and that they had "complied [with the no entry order] without complaint."

As to the defendant's friends and supporters, the judge found that "Michael Cubell, Peter Rappoli, Roy Minnehan, Paul Williams, James O'Connor, and Richard S. Levine testified that they were deterred from entering the courtroom during [e]mpanelment by the sign on the courtroom door, or were asked by a court officer to leave the courtroom during the [e]mpanelment." She did not discredit their testimony, stating only that "they failed to make themselves known to the court until late in the [e]mpanelment process when they were unavailable to come back to court." She noted that John White, a spectator who was not among the defendant's supporters, testified that he sat in the court room during empanelment on June 18 and June 20, seeing the sign but ignoring it. On June 18, he sat with a Stoughton couple (also members of the public) and on June 20, he sat "in the back where there were a couple of empty rows."

Finally, the judge found that while she could not monitor the court room closely during empanelment, she "expected that members of the public who wished to observe . . . would be allowed entry" and that because "the issue was not raised until the fourth day of [e]mpanelment . . . the court was unable to investigate and address the matter before that time." She further stated that, "[o]n June 21, Officer Sullivan was directed by the

court to allow anyone who wanted to enter the courtroom to enter. The court credits his testimony that he obeyed that directive."

Based on her findings, the judge ruled that the court room was never closed, as the defendant's family and some other members of the public were present and the "press was not excluded."[14] She also concluded that the defendant in effect consented to closure by giving up his right to be present at closed individual sidebar voir dire examinations of prospective jurors and otherwise waived his right to claim a violation of his right to a public trial by waiting until the fourth day to object.

On appeal, the defendant argues that the judge failed to satisfy procedural requirements for court room closure, making only retrospective findings to support it; did not satisfy substantive requirements for closure because the record shows that the public was excluded by court policy, regardless of and despite available space; erred in giving constitutional significance to the excluded spectators' failure to protest; and erred in her findings of fact. The defendant also claims that he did not waive his public trial right.

*Discussion.* a. *Standard of review.* As the defendant's "new trial claim is constitutionally based, this court will exercise its own judgment on the ultimate factual as well as legal conclusions." *Commonwealth* v. *Tucceri*, 412 Mass. 401, 409 (1992). We review to determine whether the defendant's Sixth Amendment right to a public trial was violated, cognizant that such a violation "is a structural error and not susceptible to harmless error analysis." *Commonwealth* v. *Baran*, 74 Mass. App. Ct. 256, 296 (2009). See *Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969).[15] Nevertheless, we do look to whether the defendant raised this issue in a timely manner because "the

[14]The judge noted, "[M]embers of the press characteristically are vigilant in asserting their rights. From their conduct, the court concludes that the [e]mpanelment was not sufficiently important to them to seek entry. . . . Apart from Messrs. Stein and Mucciarone, there was at least one other reporter present in the courtroom on June 18."

[15]See also *Arizona* v. *Fulminante*, 499 U.S. 279, 310 (1991); *Owens* v. *United States*, 483 F.3d 48, 64 (1st Cir. 2007) (*Owens*). The United States Supreme Court has reasoned, "While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." *Waller* v. *Georgia*, 467 U.S. 39, 49 n.9 (1984) (*Waller*).

right to a public trial, like other structural rights, can be waived." *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 173 (2009). See *Commonwealth* v. *Williams*, 379 Mass. 874, 876 (1980); *Commonwealth* v. *Wells*, 360 Mass. 846 (1971). See generally *Mains* v. *Commonwealth*, 433 Mass. 30, 33 n.3 (2000) ("Our cases have held that even structural error is subject to the doctrine of waiver").

b. *Public trial right.* The closing of a criminal proceeding to the public may implicate rights guaranteed by both the First and Sixth Amendments to the United States Constitution. *Commonwealth* v. *Martin*, 417 Mass. 187, 192 (1994). The First Amendment implicitly grants the public, including the press, a right of access to court trials.[16] *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 604-606 (1982). The Sixth Amendment expressly grants criminal defendants the right to a public trial.[17] *Waller* v. *Georgia*, 467 U.S. 39, 46 (1984) (*Waller*). See *In re Oliver*, 333 U.S. 257, 270 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power"). The same constitutional analysis applies to a public trial claim brought under the First Amendment as one brought, as here, under the Sixth Amendment. *Commonwealth* v. *Martin*, 417 Mass. at 193 n.8.

The public trial right applies to jury selection proceedings, *Presley* v. *Georgia*, 130 S. Ct. 721, 723-724 (2010), which are "a crucial part of any criminal case." *Owens* v. *United States*, 483 F.3d 48, 63 (1st Cir. 2007) (*Owens*). See *Commonwealth* v. *Gordon*, 422 Mass. 816, 823 (1996). At that stage, "the primacy of the accused's right [to a public trial] is difficult to separate from the right of everyone in the community to attend the voir dire which promotes fairness." *Press-Enterprise* v. *Superior Court*, 464 U.S. 501, 508 (1984) (*Press-Enterprise*).

---

[16] The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

[17] The Sixth Amendment to the United States Constitution states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."

The "sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known" (emphasis in original). *Id.* Throughout a trial, an open court room "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* Thus, courts recognize a "strong presumption in favor of a public trial," *Commonwealth* v. *Baran,* 74 Mass. App. Ct. at 294, "overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise, supra* at 510.

Still, the public trial right is not absolute, and in limited circumstances a court may bar spectators from certain portions of a criminal trial. *Commonwealth* v. *Martin,* 417 Mass. at 193. To do so, a judge must make a case-specific determination that closure is necessary. *Globe Newspaper Co.* v. *Superior Court,* 457 U.S. at 608. That "determination must satisfy four requirements articulated by the Supreme Court: '[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.' " *Commonwealth* v. *Martin, supra* at 194, quoting *Waller,* 467 U.S. at 48. *Waller* and the four factors it sets out apply to the exclusion of the public from jury selection proceedings, at least when this occurs over the defendant's objection.[18] See, e.g., *Watters* v. *State,* 328 Md. 38, 45 (1992), cert. denied, 507 U.S. 1024 (1993) ("whether objection to closure is made by the defendant or the press, the public may only be constitutionally excluded from a trial, including voir dire, pursuant to a narrowly tailored order necessary to protect an overriding state interest"); *State* v. *Torres,* 844 A.2d 155, 159 (R.I. 2004) ("The *Waller* analysis applies as well to the closure of jury-selection proceedings over an accused's objections").

In claiming that his Sixth Amendment right to a public trial was violated, "[t]he burden is clearly on the defendant to demonstrate that the public was excluded from his trial." *Commonwealth*

---

[18] We discuss the defendant's objection in the present case *infra.*

v. *Williams*, 379 Mass. at 875. The judge concluded, and the Commonwealth argues to us, that the defendant failed to satisfy this burden. The judge reasoned that because (1) she did not order a closure, (2) some members of the public attended despite the "Do Not Enter" sign, and (3) the judge — through court officers — made arrangements for family and the press to be present, the court room was never "closed." We disagree.

It has been stated that a defendant's right to a public trial is not denied absent "some affirmative act by the trial court meant to exclude persons from the courtroom." *United States* v. *Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994). Nevertheless, a court room may be closed in the constitutional sense without an express judicial order. See, e.g., *Owens*, 483 F.3d at 63; *Watters* v. *State*, 328 Md. at 44, 49 (defendant's Sixth Amendment right to public trial was violated where deputy sheriff closed court room to public, including members of defendant's family and press, for entire morning of jury voir dire and selection; court rejected State's claim that no violation occurred because error was committed by deputy sheriff without knowledge of judge; new trial ordered).[19] Cf. *Martineau* v. *Perrin*, 601 F.2d 1196, 1198-1200 (1st Cir. 1979) (court room doors locked for at least three days of six-day trial, unbeknownst to judge, who ordered doors open on learning of misunderstanding; Sixth Amendment public trial right was violated, but defendant was found to have knowingly and intentionally waived right on facts of particular case).

Some courts have determined that a court room closure may be so limited in scope or duration that it must be deemed "de minimis" or trivial, and not in contravention of the Sixth or First Amendment public trial guarantees; whether the closure was "inadvertent" on the part of the judge is sometimes mentioned as one factor relevant to the analysis.[20] We agree with the principles discussed in the cases cited in note 20, *supra*, but those

---

[19]See also *United States* v. *Keaveny*, 181 F.3d 81 (1st Cir. 1999) (remanding case for evidentiary hearing on defendant's claim that Sixth Amendment violated where, he alleged, jury selection was closed for some hours by court security officer), cited in *Owens*, 483 F.3d at 63.

[20]See, e.g., *Peterson* v. *Williams*, 85 F.3d 39, 44 (2d Cir.), cert. denied, 519 U.S. 878 (1996) (finding de minimis closure where public excluded for twenty minutes, unknown to judge); *United States* v. *Al-Smadi*, 15 F.3d 153, 154-155 (10th Cir. 1994) (same). See also *Braun* v. *Powell*, 227 F.3d 908, 917-920 (7th

principles do not govern here. While the judge indicated that she herself was not aware of the "Do Not Enter" sign until the fourth day of empanelment, there is no dispute that the sign was affixed to the court room door for three days, and that, pursuant to an established policy, court officers told a number of individuals that they would not be permitted in the court room during the jury selection process. The exclusion of members of the public and the press for at least three days of jury selection through the intentional application of a court house policy cannot qualify as inadvertent. Nor can it be characterized as so trivial or de minimis as to fall entirely outside the range of "closure" in the constitutional sense.

We discuss briefly the additional reasons mentioned by the judge for her conclusion that no constitutionally implicated closure occurred: the defendant's family members were present throughout; other members of the public were also present when there was room to accommodate them without the risk of tainting prospective jurors; and members of the press were not excluded from the court room. It is commendable that the judge and court officers made specific arrangements to ensure that the defendant's family members could be seated in the court room throughout jury empanelment. Cf. *Owens* v. *United States*, 517 F. Supp. 2d 570, 573 (D. Mass. 2007) (two of defendant's family members sought entry but were excluded from court room for entire empanelment). It is also true that the judge found that three members of the public (John White and a couple from Stoughton) came into the court room during empanelment despite the sign. However, the presence of spectators who "saw the sign, but ignored it," has little or no bearing on whether the court room was closed. See *Peterson* v. *Williams*, 85 F.3d 39, 44 n.7 (2d Cir.), cert. denied, 519 U.S. 878 (1996) ("possible existence of some spectators brave or arrogant enough to seek admission does not convert the court room into an open one"). Furthermore, the judge's findings also reveal that six individuals — who were, significantly, friends and supporters of the defendant — were denied entry by virtue of the sign or by the explicit statement of

Cir. 2000), cert. denied, 531 U.S. 1182 (2001) (excluding one person did not violate public trial right; court applied analysis of *Peterson* v. *Williams*, *supra*).

a court officer. See *In re Oliver*, 333 U.S. at 271-272 ("And without exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged"); *Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969) (same).[21],[22]

We conclude the defendant has established that, for at least three days of the jury selection proceedings in his case, the court room was closed in the constitutional sense, at least to some degree. As just discussed, however, the record makes clear that there were family members and some other individuals beyond the parties and counsel present in the court room during empanelment. For that reason, there was a partial rather than a full or complete closure of the court room. See, e.g., *Commonwealth* v. *Martin*, 39 Mass. App. Ct. 44, 48-49 (1995) (exclusion of defendant's mother during testimony of witness due to intimidation concern, but allowing press to remain, constituted limited closure).[23] It is therefore necessary to consider

[21]The United States Court of Appeals for the First Circuit has declined to evaluate the exclusion of friends or family members under a different standard from the standard applied to the general public, noting that the "already stringent" *Waller* requirements "adequately safeguard a defendant's interest in permitting his family to be present in the courtroom." *Martin* v. *Bissonette*, 118 F.3d 871, 876 (1st Cir. 1997). See *Owens*, 483 F.3d at 62 n.12.

[22]With respect to the press, as the evidence and the judge's findings on the new trial motion indicate, there was a section of the court room reserved for the press, but at least two press members, who may not have identified themselves as such, were not permitted into the court room once empanelment began. It is not at all clear from the evidence whether any member of the press was actually in the court room during empanelment, and the judge's findings on the point are somewhat inconsistent. Nevertheless, the defendant cannot, and does not, rest his claim of public trial right violation on the exclusion or the absence of any press in the court room. See *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 341 (1994). At the same time, the exclusion of the two reporters mentioned in the judge's findings is clearly relevant to the defendant's argument that members of the public generally were excluded.

[23]See also *United States* v. *Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989), cert. denied sub nom. *Charley* v. *United States*, 506 U.S. 958 (1992) (excluding defendants' families during testimony of one witness constituted partial closure); *Douglas* v. *Wainwright*, 739 F.2d 531, 532 (11th Cir. 1984), cert. denied, 469 U.S. 1208 (1985) (case "entailed only a partial closure, as the press and family members of the defendant, witness, and decedent were all allowed to remain"); *Ex parte Easterwood*, 980 So. 2d 367, 376 (Ala. 2007) ("A partial closure usually entails the exclusion of the general public from the courtroom proceedings while allowing the defendant's family, friends, and

whether a partial court room closure is governed by the same constitutional standards as a complete closure.

"Although *Waller* addressed the *complete* closure of a trial to the public, federal and state courts have subsequently extended the *Waller* analysis to *partial* closures of trials . . ." (emphasis in original). *State* v. *Ortiz*, 91 Haw. 181, 191 (1999). See, e.g., *United States* v. *DeLuca*, 137 F.3d 24, 33-34 (1st Cir.), cert. denied, 525 U.S. 874 (1998); *Woods* v. *Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992); *State* v. *Mahkuk*, 736 N.W.2d 675, 684-685 (Minn. 2007); *People* v. *Jones*, 96 N.Y.2d 213, 219 (2001). See also *Commonwealth* v. *Martin*, 39 Mass. App. Ct. at 48-49 (applying *Waller* factors to partial closure). We follow this lead, and therefore examine the four *Waller* factors in the context of the present case.

The first *Waller* factor — the proponent of closing the court room "must advance an overriding interest that is likely to be prejudiced," *Waller*, 467 U.S. at 48 — has been somewhat modified when applied to a partial closure. A majority of the Circuit Courts of the United States Court of Appeals and several State courts — including the Massachusetts Appeals Court[24] — have taken the approach that where a closure is partial, it is necessary to show a "substantial reason" rather than an "overriding interest" to justify the closing.[25] The judge here advanced two connected reasons for the court room's partial closure to

members of the press to remain, unless a specific reason exists for excluding the latter"); *State* v. *Ortiz*, 91 Haw. 181, 191 (1999) (partial closures include "closure of a segment of the trial during which the testimony of one or more witnesses is elicited and closure limited to particular members of the public"). Cf. *United States* v. *DeLuca*, 137 F.3d 24, 33 (1st Cir.), cert. denied, 525 U.S. 874 (1998) (security screening procedure requiring public to show identification to enter court room was "at most, a 'partial' closure").

[24]See *Commonwealth* v. *Martin*, 39 Mass. App. Ct. 44, 49 (1995).

[25]See *United States* v. *DeLuca*, 137 F.3d at 34 (government not required to show partial closure "furthered a 'compelling' interest but simply a 'substantial' one"); *United States* v. *Osborne*, 68 F.3d 94, 99 (5th Cir. 1995) (adopting " 'substantial reason' test" to determine "if a partial closure meets the constitutional standards"); *United States* v. *Farmer*, 32 F.3d 369, 370-372 (8th Cir. 1994) (applying substantial reason test where court room closed to spectators other than witness's family and psychologist); *Woods* v. *Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (applying "substantial reason" test to determine whether partial closure violated public trial right); *United States* v. *Sherlock*, 962 F.2d at 1357 (applying "substantial reason" test where court excluded

spectators: (1) lack of space to accommodate the general public due to the number of prospective jurors in the court room[26]; and (2) preventing the intermingling of prospective jurors with spectators who might have some connection to or express opinions about the case, and the potential taint of the jurors that could result.[27] The first of these does qualify as substantial, and the second may in particular circumstances.[28]

---

defendants' families during testimony of one witness); *Nieto* v. *Sullivan,* 879 F.2d 743, 753 (10th Cir.), cert. denied, 493 U.S. 957 (1989) (applying "less stringent test of a 'substantial reason' " to partial closure); *Douglas* v. *Wainwright,* 739 F.2d at 533 (where proceeding not totally closed, "only a 'substantial' rather than 'compelling' reason for the closure was necessary"); *Ex parte Easterwood,* 980 So. 2d at 376 (party seeking partial closure need only advance "substantial reason," but "court still must satisfy the three remaining requirements of the *Waller* test"); *Feazell* v. *State,* 111 Nev. 1446, 1448-1449 (1995) (same); *State* v. *Garcia,* 561 N.W.2d 599, 605 (N.D.), cert. denied, 522 U.S. 874 (1997) (substantial reason test applies to partial closure); *State* v. *Drummond,* 111 Ohio St. 3d 14, 22 (2006) (judge had "substantial reason" to order partial closure). But see *State* v. *Mahkuk,* 736 N.W.2d 675, 685 (Minn. 2007) (declining to apply "different tests to complete versus partial closures"); *People* v. *Jones,* 96 N.Y.2d 213, 219 (2001) (because screening procedure raised "the same secrecy and fairness concerns that a total closure does," nothing less than "overriding interest" satisfies constitutional scrutiny).

[26]Cf. *Wilson* v. *State,* 148 Md. App. 601, 626 (2002) (no closure where deputy sheriff denied access to spectators, as "seating capacity of the courtroom had been exceeded"). Contrast *Watters* v. *State,* 328 Md. 38, 45 (1992), cert. denied, 507 U.S. 1024 (1993) ("There was not even an attempt to fill the remaining seats impartially. Rather, after the venirepersons and witnesses had taken their places, the empty seats were left vacant, notwithstanding the early arrival of the defendant's family members and their request for admission. The closure of the courtroom under these circumstances violated the defendant's Sixth Amendment right to a public trial").

[27]The judge also mentioned the need to minimize disruption. By itself, this reason carries more weight in relation to the point near the end of a trial when the judge is instructing the jury. We, like many courts, have previously held that no "closure" of a court room occurs where a judge orders that no one may leave or enter the court room during the judge's charge to the jury in order to prevent disruption or distraction of the jurors during the charge. See *Commonwealth* v. *Dykens,* 438 Mass. 827, 835-836 (2003), and cases cited.

[28]The United States Supreme Court's recent decision in *Presley* v. *Georgia,* 130 S. Ct. 721, 725 (2010), briefly addressed the concern about intermingling between prospective jurors and spectators. The Court cautioned:

"The generic risk of jurors over-hearing prejudicial remarks, unsubstantiated by any specific threat or incident, is inherent whenever members of the public are present during the selection of jurors. If

However, even in a partial closure context, the remaining *Waller* factors must be satisfied. See *Commonwealth* v. *Martin*, 39 Mass. App. Ct. at 48-49. The second *Waller* factor instructs that a closure may be "no broader than necessary to protect [the] interest [likely to be prejudiced]." *Waller*, 467 U.S. at 48. In the present case, to the extent that there were insufficient seats in the court room for all the spectators, excluding those who could not be appropriately seated was permissible.[29] See *Estes* v. *Texas*, 381 U.S. 532, 588-589 (1965) (Harlan, J., concurring) ("Obviously, the public-trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats"); *United States* v. *Shryock*, 342 F.3d 948, 974-975 (9th Cir. 2003), cert. denied, 541 U.S. 965 (2004) (no violation of defendant's Sixth Amendment public trial right where on two occasions during trial, insufficient seating space prevented some of defendant's family from being in court room). However, the record indicates that the judge did not make a particularized determination about available space for members of the public at the beginning of empanelment proceedings on any of the five days devoted in

---

broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course."

*Id.* Still, the Court recognized that "[t]here are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire," emphasizing that in such cases "the particular interest, and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Id.*, quoting *Press-Enterprise*, 464 U.S. at 510. *Presley* addressed a full closure of the court room. However, the Supreme Court's concern about the intermingling rationale appears to apply in the partial closure context as well; the record must still reflect a case-specific determination that the risk to the venire in the particular case from intermingling is a real one, and that the trial court satisfied its "obligat[ion] to take every *reasonable* measure to accommodate public attendance." *Presley* v. *Georgia*, *supra* (emphasis added).

[29]This is not to say that there is an obligation to accommodate every spectator who can find a seat anywhere in the court room; it would be permissible to exclude some spectators if the only available seats for them were located right next to the seats occupied by prospective jurors, and the judge determines, on the record, that this close proximity creates a risk of juror contamination or taint in the particular case. See *Presley* v. *Georgia*, *supra*.

whole or in part to jury selection. Nor did she address the question of space becoming available as the empanelment process progressed on any of those days. Rather, the judge's findings and the testimony of the court officers, which the judge appeared generally to credit, indicate that the public consistently was excluded from the court room based on established court policy that, for at least three days, was graphically and unequivocally communicated by the "Do Not Enter" sign. Closure by policy runs counter to the requirement that a court make a case-specific determination before a closure of any part of a criminal proceeding constitutionally may occur. Cf. *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. at 607-608 ("We agree with appellee that the first interest — safeguarding the physical and psychological well-being of a minor — is a compelling one. But as compelling as that interest is, it does not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest" [emphasis in original]).

We recognize that in court houses across the Commonwealth, insufficient space may well provide a valid reason for the exclusion of the public during at least some part of jury empanelment proceedings, because the number of prospective jurors in the venire are likely to fill all or almost all of the available seats.[30] It is not required that *every* seat not occupied by a prospective juror must be made available to the public; as noted, the possibility that jurors may be influenced or tainted by intermingling with spectators is a valid concern that may justify excluding members of the public until space permits them to sit apart from the prospective jurors. Moreover, the judge or court officers need not undertake an affirmative effort to seek out spectators when the departure of prospective jurors frees up seats. But the public trial right applies with full force during empanelment, *Presley* v. *Georgia*, 130 S. Ct. 721, 723-724 (2010), and if space in the court room is or becomes available, the judge must make sure that members of the public who wish to observe the proceedings are not prevented from doing so.

---

[30]Where the venire will initially take up the entire court room, however, it may be appropriate for the judge to announce at the outset that, because of space limitations, it is not possible immediately to accommodate members of the public, but that individuals who wish to observe empanelment proceedings will be permitted to enter the court room as space becomes available.

Here, the "Do Not Enter" sign had a preemptive and preventive effect. The judge acknowledged that space became available as the empanelment progressed.[31] Still, for at least the first three days, the sign and the court officers turned spectators away, even during periods of time when the record indicates it would have been entirely possible to accommodate them. Because the sign continued to keep the court room closed even when circumstances changed, this partial closure was too broad. See *Owens*, 483 F.3d at 62 ("Once there was sufficient space in the court room, we see no state interest — compelling or otherwise — in not permitting . . . family, friends, or other members of the public to observe the proceedings"); *State* v. *Torres*, 844 A.2d at 161-162 (where judge excluded defendant's sisters from jury selection based on space concern and where "record reveals that the courtroom was not completely filled," closure order was "broader than necessary"; new trial ordered).

The third *Waller* requirement is closely connected to the second; it focuses on consideration of "reasonable alternatives to closing the proceeding." *Waller*, 467 U.S. at 48. See *United States* v. *Sherlock*, 962 F.2d 1349, 1359 (9th Cir. 1989), cert. denied sub nom. *Charley* v. *United States*, 506 U.S. 958 (1992); *Commonwealth* v. *Martin*, 39 Mass. App. Ct. at 49. As discussed, the judge took meaningful steps in this direction, holding the empanelment proceedings in the largest available court room and reserving space for the defendant's family and the press. However, additional alternatives should have been examined. There are ways to communicate to members of the public that the court room currently cannot accommodate them other than by placing a "Do Not Enter" sign on the door. The difficulty with such a sign is that it is too easy to forget to remove it when space does become available.

Finally, *Waller* requires "findings adequate to support the closure." *Waller*, 467 U.S. at 48. In a partial closure context such as this one, a reviewing court may examine the record itself to see if it contains sufficient support for the closure, even in the absence of formal or express findings by the judge. See

---

[31]The record does not indicate how much space became available. John White, whose testimony the judge referenced and credited in her findings, stated that on Wednesday, June 20, "[t]here was an empty bench in front of me and, again, I sat in the last row."

*Commonwealth* v. *Martin,* 39 Mass. App. Ct. at 48 ("While we think that the judge should have expressly rather than implicitly determined whether the witness would have had difficulty testifying with the defendant's mother present, it was not constitutional error requiring a new trial not to do so in the particular circumstances of recent intimidation by other family members").[32] Although the record in this case offers evidence of a number of reasons to effect a partial closure during parts of the empanelment, ultimately, it does not allow us to glean sufficient support for the extensive closure that occurred. See *Bowden* v. *Keane,* 237 F.3d 125, 131 (2d Cir. 2001) ("quality and extent of the evidence that will support a closure . . . will vary from case to case, depending on the scope of the closure").

In sum, the empanelment process in the present case effected a partial closure of the court room in a manner that failed to satisfy the second, third, and fourth *Waller* requirements, violating the defendant's Sixth Amendment right to a public trial. This conclusion does not end our inquiry, however, because, as noted, a defendant may waive this Sixth Amendment right. *Commonwealth* v. *Wells,* 360 Mass. 846 (1971). Accord *Commonwealth* v. *Williams,* 379 Mass. 874, 876 (1980). The judge found that the defendant did so here in two ways. The first relates to the defendant's decision not to be present with his counsel at the private voir dire examinations of individual jurors by the judge at sidebar. The judge stated that the defendant "can hardly complain that his supporters were not present for the empanelment, when he was present, but elected not to hear [the individual voir dire examinations]." She explained that while the defendant's "failure to object to the private sidebar voir dire may not strictly equate to a consensual closing of the courtroom for purposes of the Sixth Amendment, the practical ramifications . . . are that the public will not hear the jurors' responses and will not be able to observe their demeanor." We

---

[32]See also *Bowden* v. *Keane,* 237 F.3d 125, 131-132 (2d Cir. 2001) (while specific findings required before complete closure, "competent evidence from the record" can support partial closure); *United States* v. *Farmer,* 32 F.3d at 371 ("specific findings . . . are not necessary if we can glean sufficient support for a partial temporary closure from the record"); *State* v. *Garcia,* 561 N.W.2d at 607 (for partial closure, "court need only articulate findings in terms specific enough for a reviewing court to determine the basis for the order").

interpret the judge's statements as a determination of waiver, but disagree that a waiver occurred.

Individual juror voir dire examinations in this case were conducted out of hearing of the defendant and the public, but the voir dire examination process itself took place, as it should have, in open court. *Commonwealth* v. *Horton*, 434 Mass. 823, 831-832 (2001). Conducting such voir dire examinations in open court permits members of the public to observe the judge, as well as the prospective jurors. Even though the public cannot hear what is being said, the ability to observe itself furthers the values that the public trial right is designed to protect. See *Waller*, 467 U.S. at 46, quoting *Gannett Co.* v. *De Pasquale*, 443 U.S. 368, 380 (1979) (" 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' . . . In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury"); *Owens*, 483 F.3d at 61 ("a trial is far more likely to be fair when the watchful eye of the public is present"). The defendant had a right to have the public present during these individual juror examinations, just as he had a right during the trial to have spectators present in the court room while sidebar conferences took place out of their earshot. Moreover, the jury selection proceedings also included voir dire questions publicly posed to the venire as a group, to which potential jurors gave substantive responses by raising their hands. The defendant had, and did not waive, the right to have the public hear the judge's questions and witness the prospective jurors' responses. See *Commonwealth* v. *Horton*, 434 Mass. at 832, quoting *Commonwealth* v. *Gordon*, 422 Mass. at 823 ("The guarantees of open public proceedings in criminal trials cover proceedings for the voir dire examination of potential jurors concerning their qualifications to serve").

The second type of waiver identified by the judge was knowing inaction or delay. Specifically, she determined that the defendant waived his public trial right by waiting until June 21, 2007, the fourth day of jury empanelment, to object. The judge sug-

gested that this was a tactic undertaken by the defendant's counsel to create an appellate issue. The record does not support this view. Rather, it shows that on the day counsel testified that he first saw the "Do Not Enter" sign, he objected forcefully to the court room's closure three separate times, asking in substance for a new empanelment before jeopardy had even attached.[33] Nothing in the record suggests that counsel, or the defendant, was dissatisfied with the jurors who had been selected by that point in the proceedings, or that there was any dissatisfaction with the jury as ultimately constituted; as the Commonwealth points out, the defendant did not exercise all his peremptory challenges during the empanelment process.

The judge found that the defendant's counsel "was aware that the public could not be accommodated in the spectators' gallery because of the large number of jurors to be called and he wanted to make special arrangements for the defendant's family." Counsel's awareness that the court room would be closed some of the time to accommodate large numbers of jurors — leading to his request to reserve seating for the family — would not itself support a finding that he was also aware that even when the court room did have available space, the public would be denied entry because of the policy that the court room would be closed throughout the empanelment process.[34]

The defendant has thus established that the jury selection procedures used in this case violated his Sixth Amendment right to a public trial; he has also shown that he did not waive this right.[35] Given the structural nature of this error, we do not

---

[33]In her decision on the defendant's motion for a new trial, the judge stated, "[t]he defendant moved for a mistrial despite the fact that the jury had not been empaneled. [The defendant's attorney] never asked the court to dismiss the venire and recommence jury selection." It seems reasonable to assume that in requesting a mistrial at the time he did, the defendant's attorney was, in effect, requesting that jury empanelment begin again. In any event, given the defendant's objection to the empanelment procedure that had taken place, recommencing jury selection would have been the appropriate response.

[34]The defendant's counsel expressly testified that he was *not* aware that a "blanket" closure would occur. Additionally, the court officer testified that on the fourth day of empanelment, June 21, 2007, the defendant's counsel approached him and asked, "Has that sign been up?" The asking of the question suggests that counsel had only recently become aware of the sign.

[35]As to waiver, we repeat that the defendant raised his claim of Sixth Amendment public trial violation as soon as he said that he became aware of

inquire as to whether it prejudiced the defendant. See *Commonwealth* v. *Marshall*, 356 Mass. at 435. We turn, instead, to remedy. The relief for a breach of the public trial right "should be appropriate to the violation." *Waller*, 467 U.S. at 50. In *Waller*, where a judge improperly closed a suppression hearing, the Supreme Court ordered a new suppression hearing, reasoning that if that hearing led to the suppression of the same evidence, a new trial would not be necessary; it would be, rather, "a windfall for the defendant, and not in the public interest." *Id.* Here, however, we cannot separately order a new jury selection apart from a new trial, and releasing the transcripts of empanelment, as has been suggested, will not appropriately remedy the violation. Cf. *Press-Enterprise*, 464 U.S. at 513 (where judge closed court room for six weeks of juror voir dire in violation of First Amendment right of plaintiff newspaper, plaintiff entitled to transcript of voir dire proceedings as remedy). The defendant is entitled to a new trial.

c. *Sufficiency of evidence claims.* The defendant argues that

---

the "Do Not Enter" sign, and at a time when the violation could have been remedied by beginning the empanelment process anew. Cf. *Commonwealth* v. *McDuffee*, 379 Mass. 353, 359 (1979) (noting that "the rationale behind the requirement of a specific exception is to enable the judge to make any necessary correction"). Cf. also *Commonwealth* v. *Reid*, 384 Mass. 247, 257-258 (1981) (where defendant did not object to portion of jury charge challenged on appeal, she failed to preserve issue, given rule that party claiming error in charge must bring it to judge's attention to permit judge to correct error, if any). There may well be tactical reasons — a favorable jury composition, for example — why a defendant and his counsel do not object to the exclusion of the public from his trial. See *Martineau* v. *Perrin*, 601 F.2d 1196, 1200 (1st Cir. 1979) (finding waiver where "petitioner's attorney was caught on the horns of a dilemma at the time he discovered that the [court room] doors were locked. He felt that the case was proceeding well and saw no harm suffered by the petitioner due to the closed court room. In fact, he felt that the effect was probably to petitioner's benefit. If a motion for mistrial were made and granted, then what was perceived at the time as a good chance for acquittal would go down the drain. Counsel fully explained the situation to petitioner, told him what his decision was and then informed his client that 'at any time he wanted to' he could get up and object himself, which petitioner did not do"). Cf. *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 174 (2009) (remanding for hearing to determine whether counsel had sound tactical reason for declining to object to partial closure of court room during complainant's testimony and whether defendant agreed). Failure of a defendant or his counsel to raise an objection when first made aware of an alleged public trial right violation is, at the very least, a strong indication of waiver. See *Commonwealth* v. *Wells*, 360 Mass. 846 (1971).

the judge erred in denying his motions for a required finding of not guilty on the two charges of witness intimidation and the charge of filing a false police report, which he made at the close of the Commonwealth's evidence.[36] In his view, the Commonwealth presented insufficient evidence to support his conviction of any of these crimes. In reviewing the defendant's claims, we ask whether, viewing the evidence in a light most favorable to the Commonwealth, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

(i) *Witness interference.* At all times relevant to this case, G. L. c. 268, § 13B, the statute defining the crime of interference with a witness, required proof that "(1) the target of the alleged intimidation was a witness against the defendant in some stage of a criminal proceeding; (2) the defendant wilfully tried to influence or interfere with the witness; (3) the defendant did so by means of 'misrepresentation, intimidation, force or express or implied threats of force'; and (4) the defendant did so with the purpose of influencing the . . . witness." *Commonwealth* v. *Casiano*, 70 Mass. App. Ct. 705, 708 (2007), citing G. L. c. 268, § 13B, as amended through St. 1996, c. 393, §§ 2-4.[37]

The witness interference charges concerned two individuals, Jamie Kelly and Brian Sexton. Viewed in the light most favorable to the Commonwealth, the evidence relating to Jamie Kelly

---

[36] We find no indication in the record that the defendant moved for a required finding of not guilty with respect to the charge of filing a false police report. We discuss this point *infra*.

[37] General Laws c. 268, § 13B, as amended through St. 1996, c. 393, §§ 2-4, read, in relevant part:

> "Whoever, directly or indirectly, willfully endeavors by means of a gift, offer or promise of anything of value or by misrepresentation, intimidation, force or express or implied threats of force to influence, impede, obstruct, delay or otherwise interfere with any witness or juror in any stage of a trial, grand jury or other criminal proceeding or with any person furnishing information to a criminal investigator relating to a violation of a criminal statute of the commonwealth . . . shall be punished . . . ."

In 2006, G. L. c. 268, § 13B, was amended, see St. 2006, c. 48, § 3, but the amended version has no bearing on this case.

included the following. Kelly was working as a bank teller on April 30, 2002, when the defendant entered the bank in police uniform and asked her to verify that Hills's account contained sufficient funds to cover the $9,000 check that Hills wrote to Marinilli. She told the defendant that it did not. Kelly did not hear from the defendant again until September, 2004, a few weeks before the grand jury investigation into his conduct began, when he called to tell her that "him and Mr. Hills were going to court." Kelly testified that the defendant "wanted me to sign a statement that he wrote up for the court" about his actions at the bank.[38] During the call, he went over the events of April 30, 2002, with Kelly, but she "did not think it was the way it happened." She testified, "I don't remember exactly what was said, but I just didn't agree with it." Kelly "didn't feel right" signing the statement the defendant asked her to adopt as her own. Kelly told the defendant this, and he asked her to meet with him about the statement. Not wanting to do so, she "just never talked to him again after that." He then called her "close to ten times." Kelly reported this to her manager. She testified, "I felt intimidated. I didn't feel comfortable with the whole situation."

With respect to Brian Sexton, the evidence showed that in April, 2002, Sexton, a salesman for Hills's company, drove Hills to several meetings with the defendant and was at Hills's office when the defendant went there to confront Hills. A few weeks later, Hills asked Sexton to prepare a statement for the court about what transpired in the office between Hills and the defendant.[39] Sexton told Hills that if Hills wrote an accurate statement, Sexton would sign it. In August, 2004, approximately one month before the grand jury proceedings in the defendant's case began, Sexton was having dinner in a restaurant owned by a man named James Marathas. Marathas approached Sexton

---

[38]Neither the statement the defendant asked Kelly to adopt, nor a subsequent statement that Kelly prepared herself, was introduced in evidence at trial. Thus, our knowledge of the contents of those statements is limited to the testimony, which sheds little light, other than to indicate that Kelly believed the statement the defendant asked her to sign contained misrepresentations about what happened at the bank on April 30, 2002.

[39]Sexton's statements were not introduced in evidence, but were marked for identification. As with Kelly, our knowledge of the substance of the statements comes solely from Sexton's testimony.

and told him that he had in his possession a document on which Hills had forged Sexton's signature. When Sexton went to Marathas's office the next day to see that document, Marathas could not find it. Marathas changed the subject, stating, "You know, the thing that's going on with Dave Cohen? . . . You wrote a statement for that, didn't you?" Sexton acknowledged that he had, referring to the statement Hills had helped him to prepare, and said that he wished he was not involved, as he was "reluctant to be involved with Hills or [the defendant]." Marathas asked, "Well, have you thought about writing out another statement?" Marathas offered to telephone the defendant. Sexton asked him not to, but Marathas persisted, and placed a call to the defendant. Within the hour, the defendant contacted Sexton and asked Sexton to meet him at another restaurant owned by Marathas. Sexton agreed and went to that restaurant. Despite the purportedly impromptu nature of the meeting, the defendant arrived at Marathas's restaurant with a copy of Sexton's 2002 statement in hand. Sexton testified, "[The defendant] wanted me to — well, we discussed writing another statement." He said, "Now, I can see, looking back, that the reason to write that statement was to — I'm looking for the right word — discredit Hills."

Sexton went with the defendant to Marathas's office in the basement of the restaurant, where the defendant sat down at a computer and began to type.[40] Sexton stated that what the defendant typed "didn't make sense to me, so I asked him to remove what he was typing." According to Sexton, the defendant told him "how the paragraphs in the statement made sense." When the defendant and Sexton finally agreed on a statement, the defendant asked Sexton to sign it under pains and penalties of perjury. Sexton did not want to do so because "everything was happening too fast" and he "didn't feel completely good about it." Sexton asked for time to speak with his lawyer. At that point, the defendant, who had told Sexton at the beginning of the meeting that he knew his lawyer well, sent Sexton's lawyer a copy of the second Sexton statement by electronic mail. Sexton then had a conversa-

---

[40]The defendant was not in uniform when he met Sexton at the restaurant and Sexton testified that he and the defendant agreed that the defendant was not meeting with him "as a police officer or as an attorney." However, Sexton also testified that, at the time, he knew that the defendant was a Stoughton police officer.

tion with the lawyer, in which the lawyer advised him that his second statement did not take away from his first, and that it was up to him whether to sign it. When Sexton went to his lawyer's office a day or two later to sign the statement drafted by the defendant, the lawyer was not there because his wife was in labor. However, the defendant *was* at the lawyer's office to meet Sexton. Sexton signed the statement and gave it to him.

Sexton testified that when he signed the second statement, he was upset with Hills, who owed him money and had lied to him about a potential business partnership. Nonetheless, when the defendant's counsel asked him, "Were you intimidated by David Cohen?" Sexton replied, "A little bit, yes." Sexton said of the basement meeting, "I asked: Should we be doing this? Because I did not feel — I felt kind of a little intimidated." Sexton later testified, "I felt a bit coerced, but he did not threaten me." The prosecutor responded, "Okay. Did you feel duress?" Sexton replied, "Yes." He later added, "I did not have plenty of time to talk to an attorney because [the defendant] wanted it done the next day. He was pushing me to get it done."

In order to prove the crime of interference with a witness, G. L. c. 268, § 13B, there must be sufficient evidence that the defendant wilfully endeavored to influence the witness by one of the means specified in the statute.[41] See, e.g., *Commonwealth v. Conley*, 34 Mass. App. Ct. 50, 53 (1993) (where Commonwealth alleges witness interference by intimidation, it must prove that defendant wilfully endeavored to influence or interfere with witness, and that he did so by intimidation, force, or threats of force). In this case, the means advanced by the Commonwealth were misrepresentation and intimidation.[42] Although the Commonwealth's evidence clearly was not overwhelming, a rational

[41]The defendant does not challenge the sufficiency of the evidence regarding the "witness" element of this crime, i.e., that both Kelly and Sexton were to be witnesses against him.

[42]The defendant claims that because the judge instructed the jury on two "theories" of witness interference — interference by means of intimidation and interference by means of misrepresentation — and the jury returned general verdicts, the evidence had to establish both that he (1) intended to intimidate and (2) made intentional misrepresentations to both Jamie Kelly and Brian Sexton. The defendant objected to the Commonwealth's request to charge the jury on a misrepresentation theory, but he did not request a specific unanimity instruction. Even if he had, it is not at all clear that he would have

juror could have concluded that the defendant sought to interfere with and influence Kelly and Sexton by both means at issue. With respect to misrepresentation, a jury could reasonably conclude that the defendant intended to influence Kelly and Sexton to execute written statements containing factual inaccuracies about the 2002 events they had witnessed by making to each of them misrepresentations about those events.

Turning to intimidation, the defendant's "subjective intent is not relevant." *Commonwealth* v. *Gordon*, 44 Mass. App. Ct. 233, 236 (1998). "It is sufficient that a reasonable fact finder could have inferred from the circumstances that he did, indeed, intimidate [the witnesses]." *Id.* Additionally, an "action does not need to be overtly threatening to fall within the meaning of 'intimidation.' " *Commonwealth* v. *Casiano*, 70 Mass. App. Ct. at 708, quoting *Commonwealth* v. *Gordon*, *supra* at 235-236. Calling Kelly ten times qualifies as intimidation. Kelly testified that she did not feel comfortable, and reported this to her manager. As for Sexton, a jury could reasonably conclude the defendant intended to intimidate him so that he would sign a new statement. The defendant's application of time pressure and his show of authority, both formal (for example, while in uniform) and informal, warrants this inference. Moreover, "the timing of the defendant's actions makes it more, rather than less, likely that he was trying to intimidate the witness." *Commonwealth* v. *Robinson*, 444 Mass. 102, 109 (2005). See *Commonwealth* v. *Casiano*, 70 Mass. App. Ct. at 709. Although Sexton's testimony suggests mixed motives for his decision to sign the second statement, he testified that he was, in fact, intimidated. "Jurors, of course, are free to believe or disbelieve the testimony of each witness in whole or in part." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 457 (2009). In sum, the judge properly denied the defendant's motion for required findings of not guilty on both counts of witness intimidation.

been entitled to one. See, e.g., *Commonwealth* v. *Santos*, 440 Mass. 281, 289 (2003) ("While it may be difficult to construct a precise definition identifying those alternate 'theories' that will require specific unanimity, it is clear that the rule does not automatically extend to every alternate method by which a single element may be established. As here, those alternatives are often closely related, and no purpose would be served by requiring the jury to dissect the evidence and agree as to which related, or even overlapping, variant of the same element had been proved"). In any event, there was sufficient evidence in this case of both intimidation and misrepresentation.

(ii) *Filing a false police report.*[43] To support a false police report conviction, the evidence must establish that the defendant, acting as a police officer in the course of his official duties, filed a false written report "knowing the same to be false in a material matter." G. L. c. 268, § 6A. The defendant concedes that "a jury could find that some aspects of [his] police report were inaccurate." Indeed, testimony from Sexton[44] and Hills[45] contradicted the statement the defendant made in his report that Hills had "a large black folding knife in the pen organizer of his desk" and that he handcuffed Hills for "my own safety." Still, he claims this inaccuracy was not "material" because it did not affect whether his report properly led to a complaint against Hills.

The defendant points to the court's interpretation of the term "material" in the perjury statute, G. L. c. 268, § 1. In that context, a statement is "material" if it tends "in reasonable degree to affect some aspect or result of the inquiry." *Commonwealth v. D'Amour*, 428 Mass. 725, 744 (1999), quoting *Commonwealth v. McDuffee*, 379 Mass. 353, 360 (1979). The defendant claims the "inquiry" here is whether his police report provided probable cause to support a criminal complaint against Hills. We disagree. A police report has purposes beyond simply establishing the basis for a complaint application. While the defendant's statement, "For my own safety, I walked around the desk, secured

---

[43]As previously stated, there is no indication in the record that the defendant preserved his claim of error regarding the sufficiency of the evidence on the false police report charge, although the Commonwealth does not raise the point. We review the claim for a substantial risk of a miscarriage of justice. *Commonwealth v. McGovern*, 397 Mass. 863, 867-868 (1986).

[44]In Sexton's first statement he said he never saw a knife in Hills's office. In his second statement, the one crafted with the defendant's help, Sexton said, "I know for a fact that a knife referenced in David Cohen's report was a black handled letter opener that did resemble a knife, and it was, in fact, in Mr. Hills pen holder, and if Mr. Hill[s] was standing beside his desk, it was placed on the left side of the desk." From Sexton's testimony, a jury could reasonably infer that the defendant falsely reported that Hills had a knife and tried to cover up that untruth by helping Sexton to "remember" seeing a letter opener that looked like a knife. An inference of intent drawn from circumstantial evidence "need only be reasonable and possible and need not be necessary or inescapable." *Commonwealth v. Casale*, 381 Mass. 167, 173 (1980).

[45]Hills testified that he did not become irate, that he did not have a knife in his office, and that the defendant did not at any time call for backup or unhook his mace can or gun.

Hills with handcuffs and pat-frisked him for weapons," was not required for a complaint of larceny or uttering to issue against Hills, it certainly affected any inquiry into whether the defendant acted permissibly and reasonably in handcuffing Hills. Because the basis for the defendant's decision to handcuff Hills could become relevant if, for example, Hills filed a complaint against the defendant in court or with the police department, the defendant's statements about handcuffing qualify as a material part of the police report regarding the incident. Therefore, the judge did not err in denying the motion for a required finding of not guilty.

d. *Attempted extortion instruction.* General Laws c. 265, § 25, defines the crime of attempted extortion by a police officer, and provides in relevant part:

> "*[A]ny police officer* . . . who verbally or by written or printed communication *maliciously and unlawfully* uses or threatens to use against another the power or authority vested in him, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished."

When the judge instructed the jury on this case, she explained the element of "malicious and unlawful" intent as follows: "Third, the Commonwealth must prove that the threatening communication was undertaken maliciously . . . . Maliciously means that the defendant intended to inflict injury without legal excuse."

The defendant argues that the judge understated the Commonwealth's burden on this element by failing to explain how the jury should evaluate the lawfulness of a police officer's conduct. He contends that without such special guidance, the instruction criminalized a police officer's lawful and discretionary act of giving a thief a choice between return of stolen goods and criminal prosecution. As the defendant objected to the instruction, we review for prejudicial error. *Commonwealth* v. *Clemente*, 452 Mass. 295, 319 (2008), cert. denied, 129 S. Ct. 1329 (2009).

The judge's instructions included a statement that maliciously "means that the defendant intended to inflict injury or otherwise do wrong *without legal excuse*" (emphasis added). She added,

"The emphasis in the crime of extortion is on the *wrongful* use of fear to compel the alleged victim to surrender something of value to the extortionist" (emphasis added).[46] The instruction adequately conveyed to the jury the difference between permissible discretionary actions by a police officer and wrongful conduct that would fall within the statute's scope.[47] There was no error.

e. *Prosecutorial misconduct.* As a final matter, the defendant lists several allegations of prosecutorial misconduct. The "sampling of low blows" that the defendant cites does not rise to the level of appellate argument. *Commonwealth* v. *Simpson*, 434 Mass. 570, 577 n.3 (2001), citing Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

f. *Conclusion.* The order denying the defendant's motion for a new trial is vacated. The judgments of conviction are reversed and the verdicts set aside. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[46]The defendant claims the judge made matters worse by stating that a "malicious threat is criminal if it was intended to enforce the payment of a just debt." Immediately after making that statement, the judge clarified what she meant, stating: "Again, a malicious threat is criminal *even if* it was intended to enforce the payment of a just debt; *that is, money that the victim* rightfully may have owed. If you find the threat to be malicious as I have just described, then such threat is criminal *even if* the alleged victim actually owed a debt *to another person*" (emphasis added). In the context of the entire instruction, the judge correctly stated the law. Cf. *Commonwealth* v. *Coolidge*, 128 Mass. 55, 59-60 (1880) (no error in instruction that "threat, made by one whose goods had been stolen, that he would prosecute the supposed thief . . . could not be considered as made maliciously, and with intent to extort property, *unless* there were other proofs of malice and intended extortion" [emphasis added]).

[47]The defendant sought an instruction to the effect that in evaluating whether a police officer acted maliciously, the jury must "presume that the acts of [the defendant], being a police officer, were done legally, in good faith, and within the scope of his official duties." Such an instruction would effectively immunize police officers from conviction. The judge did not err in declining to give it.