**STATE of Missouri, Respondent,**

v.

**Randy G. STONE, Appellant.**

**No. ED 91186.**

Missouri Court of Appeals, Eastern District, Division One.

Feb. 10, 2009.

Application for Transfer to Supreme Court Denied March 26, 2009.

Application for Transfer Denied May 5, 2009.

Brocca L. Smith, Clayton, MO, for appellant.

Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

Defendant Randy Stone appeals from the judgment entered after a jury convicted him of one count of involuntary manslaughter in the first degree in connection with a fatal car accident. Defendant claims the trial court erred in: (1) overruling his motion for judgment of acquittal because there was insufficient evidence to establish that he was criminally negligent;

(2) failing to declare a mistrial because the State offered evidence in its case in chief that it knew was inadmissible; and (3) failing to *sua sponte* declare a mistrial when the State repeatedly questioned a witness regarding inadmissible evidence and the trial court sustained the Defendant's objections to that evidence. We affirm.

### Factual and Procedural Background

On June 25, 2006, at about 1:45 a.m., Defendant was driving southbound on a two-lane highway when he collided with a northbound vehicle driven by the victim, David Grass. Mr. Grass died as a result of his injuries. Gouge marks in the road indicated that Defendant's car was 5.8 feet over the centerline when it struck Mr. Grass's vehicle.

Deputy Sheriff Ben Jansen and his partner were the first law enforcement officers to respond to the scene of the accident. At trial, Deputy Jansen testified that, when he arrived at the accident site, he found Mr. Grass unconscious. Deputy Jansen then approached Defendant's vehicle and asked him what had happened, and Defendant responded, "Am I going to jail?" Deputy Jansen noticed a strong odor of alcohol coming from the Defendant's car.

Shortly thereafter, the fire department arrived, extricated Defendant and Mr. Grass from their vehicles, and placed the men in separate ambulances. State Trooper Carl Bone testified that he arrived at the scene at 2:11 a.m. and interviewed Defendant in the ambulance. Trooper Bone testified that Defendant's "eyes were bloodshot, his pupils were dilated, his eyes were glassy, and [Trooper Bone] also smelled the odor of intoxicating beverage inside the ambulance." When Trooper Bone asked Defendant whether he had been drinking, Defendant replied that he had "had a few." As Trooper Bone was preparing to conduct field sobriety tests, EMS informed him that they needed to transport Defendant to the hospital. Trooper Bone finished his work at the accident site and proceeded to the hospital to continue to interview Defendant.

Trooper Bone arrived at the hospital at 2:40 a.m. and administered an horizontal gaze nystagmus ("HGN") test on Defendant. The HGN test examines a subject's eye movements for involuntary jerking, or nystagmus, to determine whether he is intoxicated. To conduct an HGN test, a law enforcement officer instructs the subject to hold his head still and track with his eyes the lateral movement of an object, usually a finger or pen, held twelve to fifteen inches from the subject's face. Trooper Bone testified that he observed nystagmus in both of Defendant's eyes. Trooper Bone also administered the alphabet test, asking Defendant to recite the alphabet without stopping or singing. Despite a three-second pause between two letters, Defendant passed this field sobriety test. Finally, Trooper Bone conducted a counting test, which Defendant failed. Trooper Bone then placed Defendant under arrest for driving while intoxicated.

Defendant consented to a blood test to determine his blood alcohol content. The individual administering the initial test did not hold a Type I permit from the Missouri Department of Health. A second blood test was administered at 4:20 a.m., resulting in a blood alcohol content of .087.

Following a jury trial, Defendant was found guilty of first degree involuntary manslaughter and sentenced to ten years' imprisonment. Defendant appeals.

### Discussion

1. *Sufficiency of the Evidence*

■ In his first point on appeal, Defendant claims that the trial court erred in overruling his motion for judgment of acquittal because the State failed to present sufficient evidence to establish that Defendant was criminally negligent. In reviewing a claim that the evidence was insufficient to support a guilty verdict, we accept as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993) (citation omitted). Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

To prove involuntary manslaughter, the State must establish that the defendant (1) operated a motor vehicle in an intoxicated condition [1] and (2) acted with criminal negligence in (3) causing the death of another person. Mo.Rev.Stat. § 565.024.1(2) (2000). A person acts with criminal negligence "when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Mo.Rev.Stat. § 562.016.5. "While intoxication alone does not support a conviction of manslaughter ... it is a factor which the trier of fact can consider, in connection with other evidence, in determining whether criminal negligence exists." *State v. Moore*, 128 S.W.3d 115, 119 (Mo.App. E.D.2003).

Defendant contends that evidence of intoxication coupled with evidence that he drove his vehicle in the wrong lane is insufficient to establish that he acted with a culpable mental state. However, the court has held that evidence of intoxication in combination with evidence that a defendant was driving on the wrong side of the road is sufficient to support a conviction of involuntary manslaughter. *State v. Kusch*, 712 S.W.2d 457, 460 (Mo.App. W.D.1986); *see also State v. Harris*, 670 S.W.2d 73, 77 (Mo.App. W.D.1984).

■ Moreover, a defendant's culpable "mental state can be determined from his testimony, evidence of his conduct before the act, the act itself, and his subsequent conduct." *State v. Runyon*, 619 S.W.2d 955, 957 (Mo.App. E.D.1981). Here, there was ample evidence in the record that Defendant was intoxicated and that his failure to be aware of the risk of his conduct constituted a gross deviation from the reasonable standard of care under the circumstances. Defendant told Officer Jansen that he had "had a few" drinks, and Trooper Bone testified that Defendant's eyes were bloodshot and glassy, his pupils were dilated, and he smelled of alcohol. Also, Defendant failed the HGN and the counting field sobriety tests, chemical analysis of his blood showed a blood alcohol content of .087, and Defendant acknowledged that he was driving on the wrong side of the street.

In support of his argument that the State failed to demonstrate criminal negligence, Defendant relies on *State v. Bradley*, 670 S.W.2d 123, 126 (Mo.App. E.D. 1984). In *Bradley*, the defendant challenged the sufficiency of the evidence to convict him of manslaughter by culpable

---

1. For purposes of proving involuntary manslaughter under Section 564.024(2), if a chemical analysis reveals "eight-hundredths of one percent or more by weight of alcohol in a person's blood, this shall be prima facie evidence that the person was intoxicated at the time the specimen was taken." Mo.Rev. Stat. § 577.037.1.

negligence.[2] *Id.* at 125. The court held that the fact that the defendant was driving on the wrong side of a limited access highway was not enough to establish that he was acting "in utter disregard of others" because it was dark and visibility was limited. *Id.* at 126. The court also found that, because the defendant was not the only person in the vehicle, the presence of open beer cans and an odor of alcohol in the defendant's car did not establish that the defendant was intoxicated. *Id.* at 126. However, the court held that the defendant's admission to police officers that he had been drinking "a lot" and the strong odor of alcohol on his breath indicated that the defendant was intoxicated, which, in combination with the other evidence presented at trial, was sufficient to support a conviction for manslaughter. *Id.* at 127.

Based on *Bradley*, Defendant argues that the State cannot demonstrate that he acted with criminal negligence because he did not admit to drinking "a lot." *Bradley* is inapposite. In *Bradley*, the State did not adduce evidence of the defendant's blood alcohol content and the defendant's admission that he had been drinking "a lot" was necessary to establish that the defendant was intoxicated at the time of the accident. *Id.* at 125. In the instant case, no such admission was necessary because the State presented direct evidence of presumptive intoxication through the blood test administered after Defendant's collision. *See Kusch*, 712 S.W.2d at 460 (distinguishing *Bradley* on similar grounds). We therefore hold that there was sufficient evidence in the record to find that Defendant was criminally negli-

gent in causing Mr. Grass's death.[3] Point denied.

*2. Failure to Grant Defendant's Request for Mistrial*

In his second point on appeal, Defendant claims that the trial court erred in failing to declare a mistrial due to: (1) the prosecutor's references in the opening statement to the statistical significance of the results of Defendant's HGN test; and (2) a witness's related testimony during trial. Defendant argues that the prosecutor acted in bad faith and the improper references during the opening statement and a witness's related testimony prejudiced Defendant.

The granting of a mistrial is a drastic action that should only be taken in those circumstances where no other curative action would remove the alleged prejudice suffered by the defendant. *State v. Pickens*, 699 S.W.2d 12, 13 (Mo.App. E.D. 1985). A trial court's decision to deny a motion for mistrial will only be overturned upon a finding that the trial court abused its discretion. *State v. Barton*, 240 S.W.3d 693, 702 (Mo. banc 2007). In cases involving the admission of challenged evidence, an abuse of discretion warrants a new trial only if the admission prejudiced the defendant. *State v. Rose*, 86 S.W.3d 90, 102 (Mo.App. W.D.2002). To demonstrate prejudice, the defendant must show "a reasonable probability that in the absence of such evidence the verdict would have been different." *Id.* (citation omitted).

"HGN evidence is admissible as a reliable measure of an illegal level of

---

**2.** The defendant in *Bradley* was convicted under Section 565.005, RSMo 1978, a predecessor to the current involuntary manslaughter statute.

**3.** Also, the fact that Defendant was not speeding at the time of the collision does not negate

a finding of criminal negligence as the jury could reasonably conclude that, in view of Defendant's intoxication, driving in the wrong lane at any speed involved a substantial and unjustifiable risk of death. *See State v. Garrett*, 829 S.W.2d 622, 627 (Mo.App. S.D.1992).

intoxication." *Rose,* 86 S.W.3d at 97. Further, an HGN "score of six points is clearly indicative of intoxication." *Parrish v. Dir. of Revenue,* 11 S.W.3d 652, 655 (Mo.App. E.D.1999). However, HGN test results are not admissible to estimate that a driver's blood alcohol content was at or exceeded a specific level. *Rose,* 86 S.W.3d at 97.

In his opening statement, the prosecutor described the HGN test and stated that the test, "if conducted properly, has a certain percentage rate of success in determining whether the [person's blood alcohol content] is over the legal limit [of .08 percent]." The prosecutor went on to say that Trooper Bone would testify that, based on results of the HGN test and other field sobriety tests, "he formed the belief that [Defendant] was under the influence of intoxicants, that his blood alcohol content was probably in excess of the legal limit." Defense counsel objected, arguing HGN test results may not be used to prove a specific blood alcohol content, and requested a mistrial. The trial court overruled defense counsel's objection and denied his request for a mistrial.

At trial, Trooper Bone explained that the system for scoring HGN tests assigns one point for each of the possible three indicators of intoxication per eye and that the highest possible score is six points. Trooper Bone stated that Defendant scored six points on the HGN test and that, according to a study conducted in 2004, "if a subject has nystagmus at all six points ... there is an 88 percent probability that [the subject's blood alcohol content] is above the legal limit of .08." Defense counsel then renewed his earlier objection and requested a mistrial or, in the alternative, that the trial court instruct the jury to disregard Trooper Bone's comments relating to the significance of the HGN test. The trial court sustained the objection and

worked with defense counsel to draft an acceptable limiting instruction. The trial court then told the jury, "[Y]ou should disregard that portion of the trooper's testimony and only that portion ... regarding the level of probability of a specific amount of blood alcohol content in the defendant's blood."

█ As previously stated, HGN evidence is admissible as a reliable measure of an illegal level of intoxication. *Rose,* 86 S.W.3d at 97. Under Missouri law, illegal intoxication for purposes of proving involuntary manslaughter is a blood alcohol content of .08 or greater. Mo.Rev.Stat. § 577.037.1. In this case, the State properly offered evidence of Defendant's HGN test to show that he was intoxicated and did not suggest that Defendant's blood alcohol content was at a specific level. The State's evidence regarding the HGN test's statistical accuracy simply quantified the reliability of the test when used for its proper purpose, namely to establish an illegal level of intoxication.

Even if the challenged evidence was inadmissible, "[u]nder most circumstances, a trial court acts within its discretion and cures error in the admission of evidence by withdrawing the improper evidence and instructing the jury to disregard it, rather than declaring a mistrial." *State v. Carter,* 71 S.W.3d 267, 271 (Mo.App. S.D.2002) (quotation omitted). Here, the trial court took appropriate remedial action to prevent any possible prejudice by giving the jury a limiting instruction. It is generally presumed that a jury will properly follow an instruction given by the court. *State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999).

█ Furthermore, "[a]dmission of improper evidence is harmless if the other evidence of guilt is overwhelming." *Rose,* 86 S.W.3d at 103. The evidence of the success rate of HGN tests was neither the

sole nor the strongest evidence of Defendant's intoxication. The fact that Defendant scored six points on the HGN test was admissible evidence of intoxication. Additionally, Defendant's blood test showed a blood alcohol content of .087, and Defendant failed the counting field sobriety test, drove his car on the wrong side of the road, and appeared intoxicated. Point denied.

### 3. Failure to Sua Sponte Declare Mistrial

In his final point on appeal, Defendant claims that the trial court erred in failing to *sua sponte* declare a mistrial when the State repeatedly questioned a witness about the results of a blood test that were inadmissible because the test was conducted by a medical laboratory technologist without a Type I permit. Defendant asserts that the prosecutor knew this evidence was inadmissible but nevertheless injected it into his opening statement and repeatedly reminded the jury of the inadmissible evidence during his direct examination of the laboratory technologist, Robert Moore.

Because the defendant did not preserve this point on appeal for review, we review his claim for plain error. "A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *State v. Stites,* 266 S.W.3d 261, 266 (Mo.App. S.D.2008) (quotation omitted). Our review for plain error of a trial court's failure to *sua sponte* declare a mistrial is extremely limited. *Id.* We are mindful of the fact that the "declaration of a mistrial is a drastic remedy that should be employed only in extraordinary circumstances in which prejudice to the defendant can be removed in no other way." *State v. Harris,* 824 S.W.2d 111, 114 (Mo.App. E.D. 1992). "Moreover, *sua sponte* action

should be exercised only in exceptional circumstances." *Stites,* 266 S.W.3d at 266 (quotation omitted).

The record establishes that at approximately 3:05 a.m. on the morning of the accident, Mr. Moore drew a blood sample from Defendant pursuant to standard hospital practice. Mr. Moore tested the blood sample and found a blood alcohol content of .111. At 4:20 a.m., Defendant underwent another blood test at the request of Trooper Bone. The second blood test showed a blood alcohol content of .087.

In his opening statement, the prosecutor told the jury that Mr. Moore would testify that he tested Defendant's blood, which "returned an accurate whole blood reading of .111." Defense counsel did not object. The prosecutor also explained that a second blood test administered over one hour later showed a blood alcohol content of .087.

At trial, when the prosecutor asked Mr. Moore to describe the results of Defendant's first blood test, defense counsel objected on grounds of inadequate foundation. Defense counsel explained to the trial court that Mr. Moore had not said he possessed a Type I permit issued by the Missouri Department of Health, nor had he provided proper foundation as to the procedure for drawing and testing patients' blood. The trial court sustained the objection. The prosecutor then attempted to lay the requisite foundation by questioning Mr. Moore about his certification and experience, as well as the equipment used to test blood samples. When the prosecutor repeated his question about the results of Defendant's first blood test, defense counsel again objected on the grounds of inadequate foundation, and the trial court sustained the objection. The prosecutor resumed his effort to lay a proper foundation by asking Mr. Moore

about the hospital's compliance with state and federal regulations governing blood tests before repeating his question about the test results. Defense counsel objected on the same grounds, the trial court sustained the objection, and the prosecutor called his next witness.

The State also called a criminalist employed by the State highway patrol crime lab. The criminalist testified that she had a Type I permit from the Missouri Department of Health, that she tested Defendant's blood on the night of the car crash, and that Defendant's blood alcohol content was .087 percent.

Admission of improper evidence is harmless if the other evidence of guilt is overwhelming. *Rose*, 86 S.W.3d at 103. Here, the State presented enough evidence demonstrating intoxication that the improper injection of the .111 blood test result was unlikely to affect the jury's verdict. Importantly, the criminalist, who testified immediately after Mr. Moore, stated that, almost three hours after the car accident, Mr. Moore's blood alcohol content was .087 percent. The jury likely recognized that Defendant's level of intoxication was almost certainly higher when he caused Mr. Grass's death. In addition to the evidence of Defendant's illegal blood alcohol level, two law enforcement officers testified that Defendant smelled of alcohol and appeared intoxicated, Defendant scored six points on the HGN test, Defendant failed the counting field sobriety test, and Defendant was driving his car on the wrong side of the road at the time of the accident.

We also find that Defendant was not prejudiced by the prosecution's repeated questions of Mr. Moore. "Where an improper question is asked but not answered, there generally is no prejudicial error." *Pickens*, 699 S.W.2d at 13. In the instant case, Mr. Moore never answered the prosecutor's questions regarding the results of Defendant's first blood test. Also, the trial court took proper action to prevent possible prejudice by sustaining defense counsel's objections to the prosecutor's questions and giving the jury instruction MAI–CR 3d 302.02, which informs the jurors that attorneys' questions are not evidence and that, when an objection is sustained, the jury must disregard the entire question. *See Id.* The trial court is in a better position than we are to assess the prejudicial effect of improper evidence on the jury and to evaluate the proper means of curing any resulting prejudice, and we defer to its decision. *Woods v. Friendly Ford, Inc.*, 248 S.W.3d 699, 707 (Mo.App. S.D.2008). Point denied.

### Conclusion

The judgment of conviction is affirmed.

KURT S. ODENWALD, P.J., and GLENN A. NORTON, J., Concur.