**STATE of Missouri, Plaintiff–Respondent,**

v.

**Eddie A. SALAZAR, Defendant–Appellant.**

No. SD 32032.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 2, 2013.

Motion for Rehearing and/or Transfer to the Supreme Court Denied Oct. 24, 2013.

Application for Transfer Denied Dec. 24, 2013.

Craig A. Johnston, Columbia, MO, Attorney for Appellant.

Karen L. Kramer, Jefferson City, MO, Attorney for Respondent.

DON E. BURRELL, J.

Eddie A. Salazar ("Defendant") was found guilty after a jury trial of second-degree murder for killing his infant son ("Child"). After denying Defendant's "Motion for Judgment of Acquittal or in the Alternative for a New Trial" and subsequent "Supplemental Motion for Judgment of Acquittal or in the Alternative for a New Trial" (collectively, "the new trial motion"), the trial court sentenced Defendant to life in prison. *See* sections 558.011 and 565.021.[1]

---

1. Defendant was charged as and found to be a persistent offender. *See* section 557.036.4. References to sections 565.021 and 476.170, *infra,* are to RSMo 2000. All other statutory references are to RSMo Cum.Supp.2012.

In three points relied on, Defendant contends: (1) he was denied his right to a public trial when the trial court "essentially exclude[ed] the public from [*voir dire* ]" by ordering "venire panels of such sizes to fill every available seat in the courtroom"; (2) the trial court abused its discretion in failing to strike a juror for cause who "did not unequivocally indicate an ability to evaluate the evidence fairly and impartially" and "her answers suggested a bias because she was a teacher and this case involved the death of a child"; and (3) the trial court abused its discretion "in overruling [Defendant]'s objection and request for a mistrial after the prosecutor asked its expert witness, 'I'm going to ask you to assume that [Defendant] has testified or has given testimony'" because it violated Defendant's right not to incriminate himself, "especially" when the State made two other references during the proceedings to hearing or receiving testimony from Defendant.

Finding no reversible error, we affirm.

### Background [2]

On the evening of February 4, 2010, Child was in Defendant's care. Shortly after 11:00 p.m., an officer made contact with Defendant at a Carthage residence in response to a 9–1–1 call in which Defendant stated that two men had entered his home and had taken Child. Defendant subsequently gave differing accounts of the event—including that he had found Child dead in his crib—but he eventually told law enforcement that he had shaken Child because he was frustrated that Child

would not stop crying, and Child slipped from his hands, striking his head on the tile floor. Defendant admitted throwing Child's body into a river, and Child's body was eventually recovered from the river.

Recorded statements from Defendant were admitted into evidence as State's Exhibits 3, 6, 8A, and 9. The jury also heard a recording of Defendant's 9–1–1 call, admitted as State's Exhibit 2.[3] The pathologist who performed the autopsy on Child testified that the cause of death was "blunt head trauma" and that Child had three fractures to his skull, accompanied by "swelling of the brain and bleeding inside of the head as well."

After the jury rendered its guilty verdict, Defendant timely filed the new trial motion. The new trial motion included the same issues raised now on appeal except that in addressing the public trial issue Defendant relied only on provisions of the United States and Missouri constitutions; he did not assert any statutory basis for his objection. The trial court overruled the new trial motion and sentenced Defendant as noted above. This appeal timely followed.

### Analysis

*Point I—Public Access to Jury Selection*

Defendant's first point maintains the trial court "essentially exclud[ed] the public from [*voir dire* ]" by "the filling of all seats in the courtroom" with *venirepersons* when it "was not necessary" and "the trial court failed in its duty to consider reasonable alternatives, such as bringing in veni-

---

**2.** Defendant does not challenge the sufficiency of the evidence supporting his conviction. We view the facts and the reasonable inferences therefrom in the light most favorable to the verdict. *See State v. Light,* 636 S.W.2d 157, 158 (Mo.App.S.D.1982) (sufficiency of the evidence was not challenged, but "[t]he State is entitled to the most favorable view of

the facts in evidence and the reasonable inferences to be drawn therefrom"). Our summary of the facts is limited to those necessary to address Defendant's points.

**3.** None of the recordings were deposited with this court.

*re* panels of smaller sizes, which would allow the public, including the victim's and [Defendant]'s relatives, to attend [*voir dire* ]." Defendant contends that the trial court's actions violated his rights under the Sixth and Fourteenth Amendments of the United States Constitution, article I, section 18(a) of the Missouri Constitution, and section 476.170.[4]

■ We address only Defendant's constitutional arguments because he failed to offer an objection at trial based upon the statute. *See State v. Webb*, 725 S.W.2d 901, 904 (Mo.App.E.D.1987) ("The assignment of error in a motion for new trial and in the points relied upon submitted to this court must be based on objections made and reasons assigned at the time the alleged error occurs"). Defendant also failed to offer any case law or argument concerning the application of the statute to the facts of his case. *See State v. Edwards*, 280 S.W.3d 184, 190 (Mo.App.E.D. 2009) (the contention presented in the point relied on must be developed in the supporting argument).

The following facts are relevant to this point. At a pretrial hearing in January 2012, the trial court discussed as follows its plan for jury selection.

[The Trial Court]: Okay. As—so we think that originally what the Court was planning on doing was seating— how many did you tell me, [addressing a court staff member], 60 jurors at first, and have another 60 that could come in that afternoon, if we didn't get—couldn't seat the amount we needed out of the first 60. And basically, that the first day would probably end up being voir dire most of the day. If we got in to openings, and basically start the second day with the first witness.

At another pretrial hearing about a week before the March 2012 trial, defense counsel objected as follows to the anticipated *voir dire* process.

[Defense Counsel]: Judge, I am concerned about the way I understand we're going to conduct the voir dire with, I guess, 56 jurors, potential jurors brought into the courtroom. If we do that, that is going to take up every bit of the seating in the courtroom. I understand there is only limited seating in the courtroom, but on the other hand [Defendant] does have a right under the Sixth and the Fourteenth Amendments to the U.S. Constitution, Article I, Section 18A of the Missouri Constitution to a public trial. I'm sure there will probably be family members of [Defendant], and perhaps other people that would like to attend the trial.

And I would ask for some accommodations, so it is possible to have a public presence during the entire trial including voir dire. Otherwise, I think he would be denied his right to a public trial.

[The Trial Court]: They can attend the trial, but there is not going to be room in here during the voir dire and there

---

4. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" Art. I, Section 18(a) of the Missouri Constitution (1945) provides "[t]hat in criminal prosecutions the accused shall have the right to ... a speedy public trial by an impartial jury[.]" Section 476.170 provides that "[t]he sitting of every court shall be public and every person may freely attend the same." Given the similarity between the two constitutional provisions, and that the Sixth Amendment right to a "speedy and public trial" applies to the states via the Fourteenth Amendment, *Presley v. Georgia*, 558 U.S. 209, 219, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010), we will address the two constitutional provisions together.

is never room in here for the voir dire. And so I don't know of any accommodations that we can make. So that request is going to be denied.

On the first day of trial, before a *venire* panel was brought in, defense counsel again "object[ed] to the exclusion of the public during voir dire on the basis of the [Six]th and [Fourteen]th amendments to the United States Constitution Article I, Section 8[sic] and according to the Missouri State Constitution and the First Amendment to the United States Constitution." The trial court observed that 60 to 63 people had been summoned, and because the courtroom normally accommodated "43 individuals[,]" some chairs were replaced by a bench which permitted the courtroom to seat 56 people. The trial court overruled the objection and stated that "there is no room for anybody else in this courtroom and because of that during voir dire anybody else will be excluded from the courtroom." The trial court responded, "Yes" when defense counsel stated: "Motion [to allow room for members of the public to attend *voir dire* ] is overruled and continuing, Judge?"

 "[T]he Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors." *Presley,* 558 U.S. at 213, 130 S.Ct. 721. "[W]hether a defendant's right to a public trial has been violated is a question of law subject to *de novo* review." *State v. Williams,* 328 S.W.3d 366, 369 (Mo.App.W.D.2010). Generally, "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Waller v. Georgia,* 467 U.S. 39, 49, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The State agrees that "[t]he denial of the right to a public trial is structural error that requires no showing of prejudice[,]" citing *Crawford v. Minnesota,* 498 F.3d 851, 854 (8th Cir.2007) (citing *Waller,*

467 U.S. at 49–50, 104 S.Ct. 2210). Further, the defendant has no duty to suggest alternatives to closure.

The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from [Supreme] Court precedents but also from the premise that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Presley,* 558 U.S. at 214, 130 S.Ct. 721 (quoting *Press–Enterprise Co. v. Superior Court of Cal., Riverside Cty.,* 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)).

 Exceptions to the defendant's right to a public *voir dire* of potential jurors do arise. As the Supreme Court explained in *Presley,* " 'the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information' " could present such exceptional circumstances. *Id.* at 213, 130 S.Ct. 721 (quoting *Waller,* 467 U.S. at 45, 104 S.Ct. 2210). Borrowing from *Waller,* the Supreme Court in *Presley* identified four steps to ensure the proper balance between the competing interests: 1) an "overriding interest that is likely to be prejudiced" by a public proceeding must be stated; 2) "the closure must be no broader than necessary to protect that interest"; 3) "the trial court must consider reasonable alternatives to closing the proceeding"; and 4) "it must make findings adequate to support the closure." 558 U.S. at 214, 130 S.Ct. 721 (quoting *Waller,* 467 U.S. at 48, 104 S.Ct. 2210). "Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id.* at 215, 130 S.Ct. 721.

In *Presley,* the judgment was reversed when the trial court did not "consider all reasonable alternatives to closure." *Id.* at

216, 130 S.Ct. 721. During *voir dire* in that case, "the trial court noticed a lone courtroom observer" (who turned out to be the defendant's uncle), and the trial court had the man leave the courtroom (as well as the floor of the building where the courtroom was located), advising the uncle that he could return after the jury had been selected. *Id.* at 210, 130 S.Ct. 721. The trial court stated " 'there just isn't space for them to sit in the audience.' " *Id.* The trial court was also concerned about members of the public intermingling with potential jurors. *Id.*

At the hearing on Presley's motion for new trial, he "presented evidence showing that 14 prospective jurors could have fit in the jury box and the remaining 28 could have fit entirely on one side of the courtroom, leaving adequate room for the public." *Id.* at 210–11, 130 S.Ct. 721. The Supreme Court found:

> Nothing in the record shows that the trial court could not have accommodated the public at Presley's trial. Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.

*Id.* at 215, 130 S.Ct. 721. The Supreme Court did not rule on the defendant's claim that the trial court did not present "an overriding interest in closing *voir dire,* [because] it was still incumbent upon [the trial court] to consider all reasonable alternatives to closure. It did not, and that is all this Court needs to decide." *Id.* at 216, 130 S.Ct. 721.

 The instant case is similar to *Presley* in that the trial court did not

explore possible ways to accommodate the public during *voir dire,* such as splitting the panel into smaller groups. Instead, the trial court simply stated, "there is never room in here for the voir dire. And so I don't know of any accommodations that we can make." We therefore agree with Defendant that the trial court did not follow the procedure necessary to close a courtroom to the public during *voir dire.* But the question remains as to whether the error requires a new trial. To make that determination, we believe we must also determine whether the trial court's refusal to accommodate the public during Defendant's *voir dire* actually infringed on Defendant's right to a public trial.

As the State points out in its brief, "[t]he record does not demonstrate that any member of the public wished to attend [*voir dire* ] and was not allowed to do so." In other words, we would have to resort to speculation to determine, as a matter of fact, that a member of the public who wanted to attend *voir dire* was prohibited from doing so by the trial court's ruling. The record does not show that any specific person was denied entry, and Defendant did not make an offer of proof to establish any such exclusion. In stating his objection, defense counsel simply expressed his opinion that there would "probably be family members of [Defendant], and perhaps other people that would like to attend the trial." We are mindful that the hearing on Defendant's motion for change of venue suggested public interest in the case,[5] but the record does not reveal that any member of the public, or the press for that matter, was actually prevented from attending *voir dire* by the trial court's actions.

---

**5.** The editor of the Joplin Globe testified that an editorial in the newspaper "indicate[d] that the story surrounding the death of the Carthage boy has gripped the hearts of our readers and shocked the community[.]"

Defendant's response is that it is not necessary for him to show prejudice in order to prevail as "it is presumed that the trial court's directive was carried out, and it becomes the State's burden to present evidence to overcome this presumption, which it failed to do." Our understanding of presumed prejudice in this context is that there is no need for the defendant to demonstrate that the presence of the public would have altered any outcome in his trial. *See Waller,* 467 U.S. at 49 n. 9, 104 S.Ct. 2210 (to require prejudice would usually deprive a defendant of the Sixth Amendment right because it would be rare that a defendant would have tangible evidence of the injury resulting from denial of the right). The difficulty of demonstrating this type of prejudice does not exist when the requirement is simply that a defendant make an offer of proof demonstrating that someone was actually denied admittance to the courtroom, and doing so would afford the trial court the opportunity to reconsider its earlier ruling in the light of actual—

as opposed to merely hypothetical—circumstances. *Cf. State v. Lingle,* 140 S.W.3d 178, 187 (Mo.App.S.D.2004) (one purpose of an offer of proof is to permit "the trial judge to further consider the claim of admissibility after having ruled the evidence inadmissible"), *and State v. Harris,* 620 S.W.2d 349, 356 (Mo. banc 1981) ("claim of error does not fall within the ambit *of Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 [ (1974) (concerning the constitutional right of confrontation) ] when [defendant] has failed to propound a proper offer of proof").[6]

Defendant cites no binding authority for his implicit claim that there is a *presumption* in the instant case that members of the public were turned away and that the State had the burden of overcoming that presumption. He candidly acknowledges in his reply brief that he "has not found any Missouri cases addressing the issue" and directs us to cases on the issue from the state of Washington.[7]

6. As observed in *State v. Ross*:

> The conduct of a trial, like any human endeavor, will never be error free. However, the procedures adopted are designed to give the trial lawyer the opportunity and the obligation to bring any perceived error to the attention of the circuit court so that that court is afforded the opportunity to correct the error during the course of the proceedings.

292 S.W.3d 521, 526 n. 3 (Mo.App.W.D.2009). It is certainly true that the trial court might still have closed the courtroom, but the very purpose of the requirement of an offer of proof is to remove that uncertainty. "If a trial judge excludes evidence upon an offer of proof at trial, then the proponent may assert error on the exclusion." *State v. Bouser,* 17 S.W.3d 130, 141 (Mo.App.W.D.1999). This concept seems reasonable in the present context as well, especially when weighed against the delay, angst, and expense associated with a retrial.

7. In *State v. Brightman,* 155 Wash.2d 506, 122 P.3d 150, 153 (2005), the trial court directed attorneys to "tell the friends, relatives,

and acquaintances of the victim and defendant" that they could not observe jury selection because "the courtroom is packed with jurors." The court stated, "once the plain language of the trial court's ruling imposes a closure, the burden is on the State to overcome the strong presumption that the courtroom was closed" and "the State present[ed] no evidence to overcome the presumption that closure in fact occurred." *Id* at 155. Also, in *State v. Leyerle,* 158 Wash.App. 474, 242 P.3d 921, 926 (2010), the court rejected the assertion that there was nothing to indicate that the public was actually excluded from jury selection conducted in a hallway as being significant because the court did not make required findings before moving *voir dire* from the courtroom. Other cases cited in Defendant's opening brief from other states involved the actual denial of admittance to one or more persons, an offer of proof of the same, an express statement to attendees discouraging attendance, or an action by the press in its own right to attend jury selection. *See Commonwealth v. Cohen,* 456 Mass. 94, 921 N.E.2d 906, 913 (2010) (offer of proof

In one of the cited Washington cases, *State v. Duckett*, 141 Wash.App. 797, 173 P.3d 948, 951 (2007), it is apparent that the Washington court requires an extra step in the analysis by relying on a five-step review—developed in *State v. Bone–Club*, 128 Wash.2d 254, 906 P.2d 325, 327–28 (1995)—to determine the propriety of conducting a portion of *voir dire* outside of open court. "The court in *Bone–Club* adopted five workable guidelines drawn from case law construing Washington Constitution article I, section 10, and concluded this analysis is also necessary to protect a criminal defendant's rights under article I, section 22." *Id.* The extra step, when compared to *Presley*, requires that "[a]nyone present when the closure motion is made *must* be given an opportunity to object to the closure." *In re Orange*, 100 P.3d at 296; *Duckett*, 173 P.3d at 951; *cf.* 558 U.S. at 214, 130 S.Ct. 721. We also observe that while Washington or another state may require more than *Presley* requires, this does not mean that Missouri must follow the precedent of its sister states. "Though meriting our respect, decisions of the federal district and intermediate appellate courts and decisions of oth-er state courts are not binding on us." *Doe v. Roman Catholic Archdiocese of St. Louis*, 311 S.W.3d 818, 823 (Mo.App.E.D. 2010) ("[A] Missouri Supreme Court interpretation of federal constitutional law constitutes the controlling law within our state until either the Missouri Supreme Court or the United States Supreme Court declares otherwise").

The State offers a New Jersey opinion, *State v. Venable*, 411 N.J.Super. 458, 986 A.2d 743, 745–46 (2010), as support for the notion that an actual infringement must be shown. There, the trial court ruled that it did not want family members of the defendants or the victim to be in the courtroom during *voir dire* because " 'the courtroom is just going to be too crowded[,]' " and the trial court had security concerns. *Id.* Counsel for one defendant responded in agreement with the court's ruling and counsel for the other defendant made no response. *Id.* at 746. The New Jersey court observed that there was no evidence that the families were at court and desired to attend jury selection. *Id.* The court found that the closure of only the jury selection proceeding when no one affirmatively objected and no one was evidently

that several persons were denied entry during jury selection); *Commonwealth v. Alebord*, 80 Mass.App.Ct. 432, 953 N.E.2d 744, 746 (2011) (three persons denied entry during jury selection); *In re Closure of Jury Voir Dire*, 204 Mich.App. 592, 516 N.W.2d 514, 515 (1994) (newspaper moved to quash closure of jury selection); *People v. Alvarez*, 20 N.Y.3d 75, 955 N.Y.S.2d 846, 979 N.E.2d 1173, 1174 (2012) (defendant's family excluded during jury selection); *People v. Martin*, 16 N.Y.3d 607, 925 N.Y.S.2d 400, 949 N.E.2d 491, 494 (2011) (defendant's father removed from courtroom during *voir dire* ); *Turner v. State*, 413 S.W.3d 442, 2012 WL 3207291, \*1 (Tex. App.2012) (defendant's family excluded from courtroom during *voir dire* ); *Woods v. State*, 383 S.W.3d 775, 780–81 (Tex.App.2012) (two named individuals "and a number of other spectators" were told by a deputy to leave the courtroom until *voir dire* was completed); *In* re *Orange*, 152 Wash.2d 795, 100 P.3d 291, 294 (2004) (trial court denied specific requests on behalf of family members to attend *voir dire* ); and *State v. Njonge*, 161 Wash. App. 568, 255 P.3d 753, 755 (2011) (attendees were told by the trial court that the "chance" of them being able to observe *voir dire* on the following day was "slim to none") (petition for review granted *State v. Erickson*, 176 Wash.2d 1031, 299 P.3d 19 (Table) (2013)). Defendant cited two Missouri cases, but they do not directly advance his point: *State v. Saale*, 308 Mo. 573, 274 S.W. 393, 395–96 (1925) (courtroom reasonably closed to prevent further crowding of those already watching the trial), and *State v. Brooks*, 92 Mo. 542, 5 S.W. 257, 263–64 (1887) (court acted to open courtroom upon learning that it had been closed by others (abrogated on other grounds in *State v. Hathhorn*, 166 Mo. 229, 65 S.W. 756, 759 (1901))).

excluded met its "triviality standard[.]" *Id.* at 748–49. The court went on to find that the "claimed denial of the right to a public trial in this case is not merely trivial but hypothetical. We cannot say with any assurance that any actual person who desired to be present during jury selection was excluded." *Id.* at 749. A new trial was denied. *Id.*

*Venable* is not identical to the instant case—Defendant did object to the trial court's ruling here, and the announced closure anticipated the exclusion of all other persons, not just family members—but the *Venable* court noted that its decision was not based upon waiver; it was based upon the combination of circumstances discussed in the main paragraph of its analysis. *Id.* at 748 n. 3. One of those circumstances was, as in the instant case, that the exclusion was merely hypothetical.

We find the reasoning in *Venable* persuasive. In what appears to be a case of first impression in Missouri, we are unwilling to find that a new trial must be ordered when there is no evidence that a member of the public actually attempted to attend *voir dire* and was prohibited from doing so. Point I is denied.

### Point II–Refusal to Strike Juror No. 1

Defendant's second point alleges the trial court abused its discretion in refusing to strike Juror No. 1 from the *venire* for cause because she "did not unequivocally indicate an ability to evaluate the evidence fairly and impartially[.]" The point further contends that Juror No. 1

> said that she was unsure and unconvinced whether she would decide the case because she was convinced beyond a reasonable doubt or because of the nature of the case and the age of the victim, and while she *hoped* she could be fair, she admitted after hearing some of the details that she was not *sure* she

could be fair, and said being fair "could be a problem."

The following facts are relevant to this point. During the jury selection process, defense counsel asked for a show of hands if anyone was "just not sure you are going to be able to be fair in this particular case because the little boy was eight-months old and it involves a child." One *venireperson* indicated that he was a teacher and he "would have trouble [making a decision] in this particular kind of case[.]" Defense counsel asked whether there was "[a]nybody else in the jury box who feels like [this panel member.]" The following exchange then occurred with the *venire* member who would eventually be seated as Juror No. 1.

> [Juror No. 1]: Well, I just wanted you to know that I also teach.

> [Defense Counsel]: Okay. Where do you teach?

> [Juror No. 1]: [Identified school district,] early childhood.

> [Defense Counsel]: And so what age group is that?

> [Juror No. 1]: Three, four and five.

> [Defense Counsel]: How long have you done that?

> [Juror No. 1]: About 12 years.

> [Defense Counsel]: Understanding what we've talked about here today and the kind of case that this is do you think that it may give you some difficulty?

> [Juror No. 1]: I hope not.

> [Defense Counsel]: And I understand that nobody is saying that you wouldn't try. And you say you hope not. Once, again, you understand that if it may be a problem, that this is the time to try to resolve that[,] not when you get back there in the deliberation room.

[Juror No. 1]: Right.

[Defense Counsel]: Are you sure that you can decide this case just based solely on the evidence and the fact that his little boy died is not going to maybe when you get back there you think to yourself am I deciding this because I'm convinced beyond a reasonable doubt or am I deciding it because of what it is about. I[s] that going to be a balancing act for you?

[Juror No. 1]: It could be. I'm not sure.

[Defense Counsel]: All right. Are you totally convinced when you say you're not sure?

[Juror No. 1]: No.

[Defense Counsel]: Don't let me put words in your mouth. But is it fair to say you're not sure you can be fair in this particular kind of case?

[Juror No. 1]: I don't know the details. I'm hoping I could be fair. I just want you to know I teach.

[Defense Counsel]: Okay. You hope you can be fair, but when you hear the details, you're not sure you can be?

[Juror No. 1]: Yes. That could be a problem.

[Defense Counsel]: All right.

In subsequent *voir dire*, defense counsel explained the State's burden of proof, and Juror No. 1 indicated that she did not understand defense counsel's explanation. Defense counsel went on to explain that "if the State does not prove everything it has to prove beyond a reasonable doubt, it is the jury's obligation to vote not guilty whether the defendant put any—whether the defense put on any evidence or not." One *venire* panel member expressed his "personal opinion that [a defendant] should provide evidence." Defense counsel inquired of "[o]ther people in the jury box" and the following exchange occurred:

[Juror No. 1]: Yes, [i]t's—to me it's logical that the defense should show something. However, if the law states that if the prosecution proves its case, then that's enough. I can deal with that.

[Defense Counsel]: Okay. Let me be sure I understand you. If the defense puts on no evidence, do you still hold the prosecutor to his burden of proof?

[Juror No. 1]: Yes.

[Defense Counsel]: Is it going to be difficult for you to do that?

[Juror No. 1]: No.

Later in the *voir dire*, defense counsel inquired of Juror No. 1 concerning the ability to set aside any personal circumstances where a crime had been committed against a child. Juror No. 1 stated, "Well, working in education there have been crimes committed against my children[;] each one of them is different and separate. I can put that aside."

In moving for strikes for cause, Defense counsel made the following argument in regard to Juror No. 1.

[Defense counsel]: Number one. Do you want to hear reasons or just numbers at this point[?]

[The Trial Court]: Well, let's try this way. State objects to number one[?]

[The Prosecutor]: I don't think number one ever said anything that said she was [sic] fair and impartial or for her to be excused.

[The Trial Court]: All right.

[Defense Counsel]: She said that she hoped she can be fair, but she's not sure she can.

[The Trial Court]: Yes. She did say that, but that was earlier. And then later she was pretty decisive and that she said that she could take the case

and be fair and impartial. That will be overruled. Next one, please.

After both sides exercised peremptory strikes, Juror No. 1 served as one of the twelve members of the jury that decided the case.

■ "An accused must be afforded a full panel of qualified jurors before he is required to expend his peremptory challenges; denial by a trial court of a legitimate request by an accused to excuse for cause a partial or prejudiced venireperson constitutes reversible error." *State v. Stewart*, 692 S.W.2d 295, 298 (Mo. banc 1985). "To qualify as a juror, a venireperson must enter upon that service with an open mind, free from bias and prejudice." *State v. Ebeirus*, 184 S.W.3d 582, 584 (Mo. App.S.D.2006). "Where a venireperson's answer suggests a possibility of bias, that person is not qualified to serve as a juror unless, upon further questioning, he or she is rehabilitated by giving unequivocal assurances of impartiality." *State v. Stanley*, 124 S.W.3d 70, 77 (Mo.App.S.D.2004).

■ While it is better to err on the side of caution when considering a request to strike a potential juror, a challenge for cause must be assessed based upon the facts presented. *Id.* "The qualifications of a prospective juror are not determined conclusively by a single response 'but are made on the basis of the entire examination.'" *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996) (quoting *State v. Brown*, 902 S.W.2d 278, 285 (Mo. banc 1995)). "Because the trial court is in the best position to evaluate the venireperson's commitment to follow the law, it has broad discretion in determining the qualifications of a prospective juror." *State v. Rousan*, 961 S.W.2d 831, 839 (Mo. banc 1998). This superior position includes the ability to observe the individual's demeanor and attitude. *State v. McFadden*, 369 S.W.3d 727, 738 (Mo. banc 2012). As a result of that superior position, we will not reverse unless the ruling "is clearly against the evidence and constitutes a clear abuse of discretion." *Rousan*, 961 S.W.2d at 839.

■ Defendant maintains that there were two areas of concern regarding Juror No. 1's impartiality—whether the general fact that a child was killed would cause bias and whether a crime against a child had personally impacted her in a way that would cause bias. Defendant then asserts that "[w]hether [Juror No. 1] could put [the personal impact] aside does not rehabilitate her on the more general topic of whether she could unequivocally say she could be fair in a case where a child was killed."

In the context of Juror No. 1's responses, she did state that "the details" of the case "could be a problem[.]" But a close inspection of this issue reveals that it arose as part of Juror No. 1's desire to point out that she, like another juror, was a teacher of children. Indeed, Juror No. 1 not only affirmatively pointed out, "I just wanted you to know that I also teach[,]" but she went on during this particular exchange to again state, "I don't know the details. I'm hoping I could be fair. I just want you to know I teach."

In terms of Juror No. 1's "hope" to be fair, such an expression need not automatically be construed as ambivalence. "Prospective jurors often use such vernacular expressions rather tha[n] speaking in absolutes." *State v. Light*, 871 S.W.2d 59, 62 (Mo.App.E.D.1994) (where a panelist phrased some of his answers "in the form of 'I think'"). The trial court was in a superior position to determine Juror No. 1's demeanor and attitude while she was making the cited statements. *See McFadden*, 369 S.W.3d at 738.

When the topic of the personal impact caused by a crime against a child arose

later in *voir dire*, Juror No. 1 again responded in the context of her profession stating, "Well, working in education there have been crimes committed against my children each one of them is different and separate." This time, however, she added, "I can put that aside." The areas of inquiry were not so distinct when viewed in the totality of the circumstances so as to clearly constitute an abuse of discretion for the trial court to determine that Juror No. 1 was referring to both areas regarding children when she ultimately expressed that she could set aside her personal feelings. Juror No. 1's eventual unequivocal statement reflecting impartiality distinguishes the instant case from those cited by Defendant.[8]

Additionally, Juror No. 1 otherwise made it clear that she could set aside her personal opinions and follow the law. She stated that it would not be difficult for her "[i]f the defense puts on no evidence[ to] still hold the prosecutor to his burden of proof[.]" While this arose in the context of a different exchange with defense counsel, it is a part of the totality of circumstances regarding Juror No. 1, and it supports the trial court's finding based upon " 'the entire examination[,]' " *Kreutzer*, 928 S.W.2d at 866 (quoting *Brown*, 902 S.W.2d at 285),

that indicated to the trial court that Juror No. 1 "was pretty decisive ... that she said that she could take the case and be fair and impartial." Point II fails.

### Point III—Comment(s) on Defendant's Right Not to Testify

Defendant's final point contends the trial court erred in failing to sustain his objection and grant a mistrial when the prosecutor introduced a question to the pathologist by stating, "Okay, I'm going to ask you to assume that [Defendant] has testified or has given testimony that—" "because this violated [Defendant]'s rights against self-incrimination" in that it constituted a comment on Defendant's failure to testify. The point also contends that this language "was reasonably likely to direct the jury's attention to [Defendant]'s failure to testify" and "especially" in the context of two other references by the prosecutor.

The following additional facts are relevant to this claim. The first of the two other referenced statements occurred in *voir dire*, when the prosecutor stated, "Let's talk a little bit about some of the players or some of the people that you may see or hear in this trial. Maybe you

---

8. Defendant cites two inapposite cases where the basis of bias resulting in disqualification concerned the *venireperson's* own relationships to trial witnesses. *See State v. Crader*, 779 S.W.2d 749, 750 (Mo.App.S.D.1989) (prospective juror "could" but did not think he would tend to believe a witness for the State who testified on behalf of the victim company and the juror had known the "essential witness" all his life), and *State v. Thrift*, 588 S.W.2d 525, 527 (Mo.App.S.D.1979) (two panel members knew the key witness and said they "would tend to believe someone" they knew). The other cases cited by Defendant in which potential jurors were disqualified were: *State v. Schnick*, 819 S.W.2d 330, 333 (Mo. banc 1991) (State admitted that a potential juror should have been disqualified for stating that he would "believe [law officers] before

[he] would a stranger"); *State v. Houston*, 803 S.W.2d 195, 196–97 (Mo.App.W.D.1991) (potential juror stated "I probably am biased" and "he did not take the opportunity" to "give an unequivocal assurance that he could be fair and impartial"); *State v. Edwards*, 740 S.W.2d 237, 241 (Mo.App.E.D.1987) (juror was " 'afraid [she] might tend to believe' police officers and ... she expected criticism from her husband if she voted innocence where a police officer testified"); and *State v. Gordon*, 543 S.W.2d 553, 555 (Mo.App.K.C.D. 1976) (entire examination of panel member "reveals a clearly expressed doubt that he could accord [the defendant] a fair and impartial trial" despite some rehabilitation of his view and the key issue required jurors to decide whether to believe a security officer or the defendant's relative).

will, maybe you won't, I don't want to draw any inference. I'm just going to throw out some names. First of all [Defendant's name]. Does anyone know—[.]" Defendant's objection was overruled, and he made no request for a mistrial.

When defense counsel was questioning the *venire*, he stated, "In any criminal case the defendant is not required to testify and may or may not testify. Anybody here who thinks that that's a bad rule?" One *venireperson* responded affirmatively, indicating that it could "be difficult or impossible for [him] to be fair under that rule[.]" Defense counsel stated, "Let's go a little further. How many of you feel like that if in a criminal case the defendant did not testify that that would make it difficult or perhaps even impossible for you to fairly decide the case?" Two other panelists responded affirmatively. These three members of the panel were not selected for the jury.[9]

At the instruction conference, Defendant proffered Instruction No. 8, patterned after MAI–CR3d 308.14. The instruction stated: "Under the law, a defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify." The trial court included Instruction No. 8 as Defendant requested.

The second "other reference" by the State occurred in the prosecutor's rebuttal closing argument, where he said in reference to Defendant: "he wanted to tell you that [he] was upset. [He] cried. [He] panicked. Let's think about that for a little bit. He testified—he had on the video—[.]" Defense counsel objected and, outside of the hearing of the jury, asserted

that "the State has referred to the defendant testifying[.]" Defense counsel contended that this was a comment on Defendant's "right to testify or not to testify[.]" The trial court sustained the objection, but it denied Defendant's request for a mistrial. Defendant requested no lesser form of relief.

■■■■■ "The granting of a mistrial is a drastic action that should only be taken in those circumstances where no other curative action would remove the alleged prejudice suffered by the defendant." *State v. Stone*, 280 S.W.3d 111, 116 (Mo.App.E.D. 2009). "The decision to grant a mistrial is within the sound discretion of the trial court. *State v. Berry*, 168 S.W.3d 527, 535 (Mo.App.W.D.2005). We review the denial of a request for a mistrial only for abuse of that discretion." *State v. Davis*, 201 S.W.3d 141, 144 (Mo.App.S.D.2006). "Judicial discretion is deemed abused only when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Neff*, 978 S.W.2d 341, 345 (Mo. banc 1998). An instruction to the jury may cure prejudice from a comment on a defendant's failure to testify. *Id.*

■■■■■ "When considering a defendant's claim of an improper comment on his right to remain silent, the appellate court must also consider the comment in the context in which it appears." *Id.* "A direct reference to an accused's failure to testify is made when the prosecutor uses words such as 'defendant,' 'accused' and 'testify' or their equivalent." *Id.* at 344. "Whether or not the comment was inten-

---

**9.** Two of the three panelists, numbers 2 and 40, were excused for cause. The third panelist was not identified by number at the time of his response, so it is impossible to tell whether this panelist was excused for cause, was too far down the list to be reached, or did not serve for some other reason.

tional does not change the fact that it constituted a direct reference to defendant's failure to testify." *State v. Dees,* 916 S.W.2d 287, 295 (Mo.App.W.D.1995).

Here, the State maintains that the prosecutor's statement to the pathologist regarding an assumption that Defendant "testified or has given testimony" was inadvertent based upon Defendant's "many statements, viewed or listened to by the jury, in which [Defendant] purported to describe what had happened the night [Child] died." Nonetheless, the State concedes that the statement was still "a direct reference to [Defendant]'s right to testify." It insists, however, that "prejudice and reversible error cannot automatically be presumed[,]" citing *State v. Williams,* 18 S.W.3d 461, 465 (Mo.App.E.D.2000) (no prejudice where "[s]uch a state of facts and circumstances exist where the evidence of guilt is so strong it demonstrates beyond a reasonable doubt that the reference to the defendant's right to testify did not contribute to the defendant's conviction").

■ Although the State directs us to *Williams* as an example of a case where no prejudice was found regarding a direct reference to the defendant's failure to testify, the court in that case was reviewing the issue for plain error, and the evidence included "three eyewitnesses to the shooting." *Id.* A witness also testified to overhearing the defendant "admit to committing a driveby shooting[.]" *Id.* Here, the State points to no eyewitness testimony. On the other hand, Defendant does not challenge the sufficiency of the evidence to convict him, and he has not included in the record on appeal his recorded statements that were admitted into evidence. As a result, we presume that they support the jury's verdict. *See State v. Osborn,* 318 S.W.3d 703, 713 (Mo.App.S.D.2010) (court inferred that photographs, admitted as evidence but not deposited with court, supported trial court's denial of motion for judgment of acquittal and were unfavorable to an "insufficiency-of-the-evidence-argument").

The State also cites *State v. Spencer,* 50 S.W.3d 869, 875–76 (Mo.App.E.D.2001), as an example where no prejudice was found even though the prosecutor inadvertently referred to the defendant, instead of a witness, as telling the truth. In that case, a curative instruction identical to Instruction No. 8 was given. *Id.* at 876 and n. 3. The Eastern District court found that the "inadvertent, brief, and isolated comment during the early stages of the trial coupled with the jury instruction was sufficient to cure any prosecutorial error and any prejudice that may have resulted." *Id.* at 877.

Here, the prosecutor's error made while examining the pathologist was not isolated in that the prosecutor mistakenly stated in rebuttal closing argument that "he" (referring to Defendant) "testified[.]" Additionally, the prosecutor arguably made an indirect reference to testimony by Defendant when, during *voir dire,* he referred to "some of the people" that the jury might or might not hear from and then first listed Defendant.

■ Defendant cites *State v. Busey,* 143 S.W.3d 6, 12 (Mo.App.W.D.2003), where the court was "unable to conclude that there was no prejudice[,]" but in *Busey,* "the trial court took no action to limit the prejudice by proper instruction[.]" Here, a curative instruction was given at the end of the trial, and Defendant does not show that the curative instruction was inadequate to address the references to Defendant's "testifying" such that nothing short of a mistrial would have cured the error. *See Stone,* 280 S.W.3d at 116. He has also failed to demonstrate that a curative instruction given at the time of the reference or some other remedy, such as a

further inquiry of the *venire*, would have been insufficient to cure the error. "The jury is presumed to follow the trial court's instructions[,]" *McFadden*, 391 S.W.3d at 424, and Defendant has not demonstrated why that presumption was overcome in the instant case.

We also find it significant that defense counsel drew attention to Defendant's right not to testify—not in regard to any issue of waiver or invited error—but as further support for the presumption that a jury is able to follow the instructions of the trial court. Defense counsel asked if anyone thought it was "a bad rule" that the defendant was "not required to testify and may or may not testify." The one *venireperson* who responded in the affirmative was not a part of the jury. Similarly, two other panelists who felt that if the defendant did not testify it might "make it difficult or perhaps even impossible for [them] to fairly decide the case" did not serve on the jury.

██ Under these circumstances, we find that any prejudice that may have resulted from the prosecutor's statements was cured by the trial court's instruction. Point III is denied, and the judgment of conviction and sentence is affirmed.

JEFFREY W. BATES, P.J., and MARY W. SHEFFIELD, J., CONCUR.